[Crim. No. 4242. Second Dist., Div. One. July 29, 1949.]

THE PEOPLE, Respondent, v. MARTIN E. GEIBEL, Appellant.

Frederic H. Vercoe for Appellant.

Fred N. Howser, Attorney General, and Henry A. Dietz, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the District Attorney of Los Angeles County, defendant was accused in count I of a violation of section 115 of the Penal Code (offering false or forged instruments to be filed of record); in count II with the crime of forgery, and in count III of a violation of section 132 of the Penal Code (offering false evidence). To each of the foregoing counts of the information, defendant duly entered his plea of not guilty, and at the time of trial moved to dismiss count II on the ground that the information was filed more than three years after the offense was committed, and was therefore barred by the statute of limitations (Pen. Code, § 800). The court reserved its ruling on said motion, and so far as the record discloses, never passed upon the same. Trial by jury resulted in verdicts of guilty upon all three counts. Defendant's motion for a new trial was denied, as was his motion in arrest of judgment. He was thereupon sentenced to state prison for the term prescribed by law, the sentences to run concurrently. Execution of the sentences was thereupon suspended and defendant was placed on probation for a period of five years on condition that as to count I of the information he pay a fine of $1,000 within the first year of his probationary term "in installments according to his ability to pay." From the judgments and the order denying his motion for a new trial defendant prosecutes this appeal.

As grounds for reversal appellant urges: (1) That the facts stated in count II of the information (forgery) do not constitute a public offense and that the motion in arrest of judg-

ment should have been granted as to this count; (2) that the evidence is insufficient to support the verdict as to count I and that the verdict and judgment therein are contrary to the evidence and the law; (3) that the evidence is insufficient to support the verdict and judgment on count II; (4) that the evidence is not sufficient to support the verdict and judgment on count III; (5) that the trial court erred prejudicially by overruling objections to a question asked of appellant on cross-examination as to whether or not he had ever been suspended from the practice of law in California; (6) that the court erred in refusing to allow him to prove what legal services he had rendered to one Clarence Clark whose will was allegedly forged by appellant, such legal services forming the basis for appellant's claim against the estate of said Clark; (7) that the court erred in overruling objections by appellant to claimed improper cross-examination of Lawrence Gasteiger, a hand-writing expert, by the district attorney and in restricting the testimony of the same witness on direct examination; (8) that the trial court erred in the decision on numerous questions of law which arose during the course of the trial; (9) that the district attorney was guilty of prejudicial misconduct during the trial and in his argument to the jury; (10) that the trial court erred in the giving of various instructions to the jury; and (11) that the court erred in refusing to give certain instructions to the jury as requested by appellant.

The factual background of this prosecution as reflected by the record is that Clarence Clark, apparently an eccentric man living in Los Angeles, was, from the time of his father's death, a client of Martin Geibel, an attorney at law and appellant in this case. Clark was characterized at the trial as a man who was unkempt and slovenly in his dress and appearance. It further appears that appellant had been the attorney for Clark's father and mother prior to their respective deaths. Mary Silber is the secretary-stenographer for appellant and had been acting in such capacity for him since January 2, 1928. Appellant has been admitted to the practice of law in this state since March, 1909, and maintained offices in downtown Los Angeles. At the time of trial he was 69 years of age, afflicted with serious eye trouble, having a cataract in one eye while the vision of the other was completely gone. He first met the testator Clarence Clark in 1909 when the appellant was a law clerk with a firm of Los Angeles attorneys. He acted as counsel for Clark for a considerable time subsequent

to his first becoming acquainted with him, this representation in the main relating to matters which were brought into the office with respect to Clark's parents. According to appellant, his best recollection is that he first represented Clark as his sole attorney from and after the death of Clark's mother, December 25, 1923, up to the date of Clarence Clark's death, which occurred about March 4, 1946. Clark was a single man.

Gertrude Berg is a public stenographer at the Hotel Rosslyn in Los Angeles, and appellant had known her for some 10 or 15 years, during which time she had done legal stenographic work and notarizing for him.

Scott Weller, an attorney in Los Angeles, represented Cedric Gardham, a cousin of Clark, and filed a petition for special letters of administration in his behalf in the Superior Court of Los Angeles County in the matter of the estate of said Clarence Clark. In the middle or latter part of September, 1946, Weller received a telephone call from appellant at approximately 10:45 a.m. when, according to Attorney Weller, the following conversation occurred:

"A voice on the telephone said, 'This is Martin Geibel speaking, an attorney in the Merritt Building. I understand that Clarence Clark has died. I did not know that he had died. I was his attorney. I understand that you represent the Special Administrator, Cedric Gardham.' I said, 'That is correct.' He said, 'I would like to talk to you about the case.' I said, 'I will be very glad to talk to you about the case.' He said, 'Can you come over to my office?' I said, 'No, I cannot come to your office. Mr. Taintor, whose case it primarily is, is out; the Clarence Clark papers are here; I am right across the street from you; if you wish to come to the office I will be very glad to talk to you.' He said that he would be right over——.''

In from five to fifteen minutes thereafter appellant appeared at Weller's office, and according to the latter a conversation occurred, appellant, Weller, and Taintor being present. According to the testimony of Attorney Weller, appellant stated in effect that he had known Clarence Clark for years, that he was his attorney, and asked whether they had found any of appellant's cards in his effects. Appellant was told they had found his card and others, that they did not know Clarence Clark but did know Cedric Gardham who had consulted them. According to the witness, appellant told them that he would like to find out about the heirs because he said he knew who

the heirs in California were but did not know about any others. In the conversation appellant was told that Attorneys Weller and Taintor knew nothing about heirs except that there were some names mentioned in letters, particularly one Mr. Leach of Fresno who had found a will, and a Mr. Nichols who had written to them advising that Mr. Leach had found a will. Appellant then said, ''No, Mr. Leach did not find the will, I found the will,'' to which the witness inquired, ''What type of will, is it holographic?'' to which appellant replied, ''Well, it is and it isn't. It is a strange will.'' The witness Weller then inquired, ''Is it a witnessed will?'' to which appellant replied that it was a partly holographic and partly typed document. Then, according to the witness, appellant said, ''I want to find out about these heirs outside of the State of California,'' and asked whether there was a family tree. He was told that there was no family tree, that they had gone to Clark's place and searched through his papers which were in a great state of disarray, that there were hundreds and hundreds of them—40 paper bags filled with papers—but that they found no family tree and that they found no will. Attorney Weller then asked appellant where he found the will and he said that upon learning of the death of Clarence Clark he looked through some old papers and found the will while searching through the files of the estate of Clark's deceased mother. That appellant was then asked whether he had not known that the will was in said file, to which he responded, ''No,'' that he did not know it was there or he had forgotten it was there, that ''the strange thing about it is that it is almost in the words I told him (Clark) his will should be in when he drew one.''

About August 8 or 9, 1946, Attorney Weller went to Clark's home and made an investigation into his personal effects in an effort to locate a will. In the course of this investigation he found some of appellant's cards but found no letters or communications from the appellant to the decedent. He also found many cancelled checks of Clark's.

On October 4, 1946, appellant filed a will in the office of the County Clerk of Los Angeles County purporting to be the last will and testament of Clarence Clark, and paid $7.00 as a filing fee.

Cedric P. Gardham, a cousin of Clarence Clark, lived with the latter quite some time. He is the special administrator of the estate of Clarence Clark with general powers. Gardham

first heard of the death of Clark through the police department. He thereafter went to Clark's house and examined the premises. Among Clark's possessions, Gardham found a number of cancelled checks and most of the checks that were introduced into evidence at the trial were those found by Gardham at Clark's home. Mr. Gardham identified these checks as bearing the genuine signature of Clarence Clark.

The decedent Clarence Clark voted on November 7, 1944, in Los Angeles, at which time he signed the roster of voters. His signature written on this occasion was introduced into evidence.

Hearings to determine the admissibility of the will offered for probate by appellant were held in the Superior Court of Los Angeles County during the months of February and April, 1947. Appellant was one of counsel for the executor named in such will.

During the hearing upon the petition for admission to probate of the will in question appellant was sworn as a witness, identified the will in question as being that of Clarence Clark. Appellant also identified his own signature upon the will as that of a subscribing witness. During the same hearing appellant also identified another exhibit which is a purported contract between decedent Clark and appellant, under the terms of which contract, the decedent engaged the professional services of appellant Geibel ''at the yearly rate of Fifty Dollars . . ., except any matter for which a service of Fifty Dollars be inadequate, such matter to be separately treated as occasion may arise.'' The issues before the court at the hearings on the petition for admission to probate of the will of decedent Clarence Clark and a résumé of the testimony given in that proceeding is contained in the matter of the estate of Clarence Clark, deceased, in which we have this day filed an opinion, *ante,* p. 110 [208 P.2d 737], and need not here be repeated.

On August 7, 1947, a creditor's claim was filed by appellant in the above mentioned probate proceeding. This claim was in the amount of $4,472 and purported to be a claim of appellant against Clark's estate for professional services rendered as an attorney. This claim was admitted into evidence at the trial of the instant case.

It becomes unnecessary to here detail the testimony given by appellant as a witness in the foregoing probate proceeding during the year 1947 because the same is fully set forth in the matter of the estate of Clarence Clark, deceased, *ante.*

The will that was offered for probate was the document filed by appellant on October 14, 1946. The principal portion of the testamentary document is in appellant's own handwriting. The foregoing employment agreement was also offered in evidence at the trial in the instant case. Handwriting exemplars of appellant were written by him on June 20, 1947, in the office of the district attorney and were also in evidence in the instant proceeding.

Lewis C. Davis, an examiner of questioned documents, testified at the trial herein. It becomes unnecessary to set forth in detail his testimony because the same is set forth in the matter of the estate of Clarence Clark, deceased, *ante*.

Clark Sellers, an examiner of questioned documents and handwriting expert, testified that he had examined the will in question as well as the foregoing employment contract and also admitted genuine signatures of decedent Clark and appellant Geibel. It was the opinion of this witness that the person who signed the name "Clarence Clark" to the various exemplar signatures which were submitted to him as being the genuine signatures of Clarence Clark did not sign the name "Clarence Clark" on the will nor did he sign the name "Clarence Clark" on the employment contract. The witness further testified that it was his opinion that the signatures "Clarence Clark" on the will and employment contract were made by making a pencil outline, then inking over the pencil outline with pen and ink, then erasing the pencil, but that in his judgment there is still pencil in the inked lines that has not been entirely erased. That the handwriting on the will down to the signature of Clarence Clark is that of appellant, that the entire surface of the paper on that document has been erased where the name "Clarence Clark" appeared, and that the erasure occurred after the name "Clarence Clark" was written, and that the so-called "patch-work" was done after the erasure.

The aforesaid employment contract was all typed on an Underwood typewriter in one operation, with the exception of the signature. The contract was dated June 16, 1928 (it should be noted that the same was not acknowledged before a notary public until February 10, 1944). The witness Clark Sellers testified further that the typewriter used to typewrite the contract was not manufactured in 1928, that the first one came into existence no earlier than 1934 or 1935.

In the opinion of the witness Sellers, the entire area where

the name ''Clarence Clark'' is written on the employment contract had been erased with rubber, art gum or some other abrasive material of that kind, in the same manner as was the area on the will.

In his examination of the exemplars of the handwriting of decedent Clarence Clark, Mr. Sellers found no signature that was written with a slow, laborious writing movement or a hesitant writing movement. That normally a person attempting to forge a signature with which he is not familiar generally does it in a careful, slow, laborious manner. That the signatures on both the will and the contract were written slowly, laboriously and lack almost entirely the natural hidden handwriting line quality and characteristics of the genuine handwriting of Clarence Clark. That there was a general similarity as to form, but the manner in which the two questioned signatures are signed to the will and the contract was highly indicative of the fact that they were written by the tracing method, not by the free, natural, normal writing of any writer but a slow, drawn, laborious writing in which the writer was attempting to follow an outline already placed on the paper in pencil form. That the questioned signatures of Clarence Clark on both the will and the contract were written with the same writing movement, in the same manner, and *may* have been written by the same writer. *The witness Clark Sellers did not find sufficient evidence from his examination to enable him to express an opinion as to whether or not appellant forged the signatures.* The witness, however, testified that there is a similarity between the handwriting of appellant and the handwriting on the questioned signatures, especially as to the signature on the contract.

This witness further testified that ''It is my best judgment that the person who wrote the body of the document in pencil wrote the 'c-e' on top of the word 'Clarence' in pencil immediately below the signature, Exhibit 2 (the will), and wrote the word 'Clark' immediately below the signature in pencil; that 'c-e' and the 'C l a r k' was touched up or rewritten after the erasure. I can not say positively that the same writer who wrote the body of the writing in pencil made that rewriting, the 'c-e' and the word 'Clark,' but it is my best judgment that the same writer did.''

Appellant took the stand in his own behalf and testified with reference to the circumstances immediately surrounding the execution of the will. It becomes unnecessary to here state in detail such testimony because the pertinent and material parts

thereof are set forth in the matter of the estate of Clarence Clark, deceased, *ante.*

With reference to the employment agreement, appellant testified that he never had the same in his possession before February 10, 1944, but that he had written, at the instance and direction of Clark, an agreement exactly like that except that where the Security-First National Bank was written, the former document had the Security Trust and Savings Bank. He also testified that he had never seen the signature "Clarence Clark" on the upper portion of the document.

After February 10, 1944, both the will and employment contract were in a safe in appellant's office, in a file marked "Clarence Clark, Personal." That decedent Clark came into appellant's office March 6, 1945, in the morning, at which time Maurice F. Geibel, appellant's brother, and Mary J. Geibel, his sister-in-law, were present. That Clark and Mr. and Mrs. Geibel were in conversation when appellant entered his office; that at that time the following conversation transpired:

"He said, 'Some of my things have disappeared, and the typed document that you wrote for me over there in the Hotel Rosslyn is also gone; but,' he said, 'they are not as smart as they think they are. You have my will here in the office. And I wish you to go with me to rid them all out of my home,' he said. 'I'm all fed up with it.'

"Well, I said, 'Clarence, I'm sorry, I'm arranging to go to see John Lordan and he will probably send me to the hospital for a surgical operation for my sight—cataracts.'

"And he also said—made the statement that the Gardhams had sponged on him to the tune of $1,200.00.

"I then took the occasion, I said, 'Clarence——.' In fact, he wished to see his will, and I started to get his will from the safe, and I had difficulty to open the combination because of my eye condition, and my brother assisted me.

"And then I had difficulty finding his will and my brother assisted me and we were able to show him his will, and I handed it to Clarence Clark and then he handed it to my brother and I told my brother to read it, I told him that I wished to rewrite it then and there, 'Because that document,' I said, 'is a hard looking paper, and then you will have a decent looking document,' and then my brother said to him, 'That is some will, write it yourself, Clarence, and sign it and it will be better than that,' or words to that effect.

"Clarence stood up on his two feet and he said, 'That will

is all right, I am not ready to rewrite it.' My brother read it all over and handed it back to Clarence and he in turn handed it to me and directed me to put it back in the safe."

Appellant further testified that his signature on the will was genuine as was also the signature of Mary Silber, the other attesting witness.

Appellant further testified that on February 10, 1944, Clark owed him approximately $4,000 or $4,400. That this amount was arrived at by virtue of the aforesaid contract of employment. That he did not render Clark any statements for such fees, nor did Clark pay him any of the $50 retainer fee from 1928 until 1944. Appellant further testified that on March 6, 1945, decedent Clark came into his office, examined the will which was taken from the safe, returned it to appellant who replaced it in the safe. That after notification of Clark's death he searched for the will but could not find it in Clarence Clark's personal file but that Miss Silber located it, according to the best recollection of the witness, in the file of Clark's mother. Appellant further denied that he ever said to Attorneys Weller and Taintor that the will that he had in his possession was half typed and half written.

Miss Gertrude M. Berg, public stenographer and notary public at the Rosslyn Hotel, testified in corroboration of the foregoing testimony given by appellant and Miss Silber with reference to matters relating to the participation of Miss Berg in the typing of a will on February 10, 1944, with reference to an envelope being left at her office on the occasion of the visit of decedent and Attorney Geibel thereto, and also as to the taking by her of the acknowledgment of one introduced to her as Clarence Clark, to the aforesaid employment contract between the latter and appellant.

Mary Silber, secretary to appellant, corroborated the latter in regard to the formalities in connection with the claimed execution of the testamentary document in question and also with reference to the events which transpired subsequent to her arrival at her employer's office on February 10, 1944.

Miss Ida Silverman, who has known appellant for approximately 30 years and who was a client of his for approximately five years before the commencement of this prosecution, testified that she was in his office on February 10, 1944, between 1 and 2 o'clock. That she was acquainted with Clarence Clark for some 20 years; that on said February 10, 1944, at the time she came to appellant's office the decedent Clark was there and appeared to her to be erasing something when appel-

lant entered. This witness corroborated the testimony of appellant and Miss Silber with respect to the claimed signing of the will. That after appellant had departed from the office with another client, decedent Clark showed her the will in question, saying that it was what he wanted and that was the way he was going to have it. She identified the will introduced in evidence in the instant trial as being the document which Clark showed to her. This witness further corroborated the testimony of Miss Silber with reference to the typing of the employment contract by Miss Silber. She particularly recalled the question with respect to the changing of the name of the bank and that appellant was to receive $50 a year for his work.

Maurice F. Geibel, appellant's brother, testified that he had known decedent Clark for some five years prior to the latter's death. That the witness called at his brother's office on March 6, 1945, with his wife at about 8:30 or 9 o'clock in the morning. That decedent Clark came in at approximately 9 o'clock or shortly thereafter. That when Clark came into the office he seemed to be nervous and upset and was under the impression that the witness Maurice Geibel was in fact the appellant. Upon being straightened out, Clark asked whether the witness expected appellant, saying that he would like to see him. That the witness stated to Clark that the latter would have to make it brief because appellant had an engagement at Dr. Lordan's office and was to go therefrom to the hospital to have his eye operated on. That when the appellant came into the office Clark told him he was having trouble out at his home, that the Gardhams had stolen a will he had and some papers, and that they also had cheated him out of some $1,200 and squandered the money. That decedent Clark further said, ''They are not as smart as they think they are; they stole the will and now I can't find it, you will make a will of mine here in your office.'' That appellant then said to Clark, ''Clarence, I would like to have you rewrite that will.'' That appellant had difficulty opening his safe, that the witness assisted him in looking through the safe and that they found a document in a file of Clark's mother. That appellant handed Clark the complete file, the latter read over the document again, then handed it to appellant's brother who read it and noted where it had been signed. That after the witness had examined the will he handed it back to Clark, the latter handed it to appellant and according to the best

recollection of the witness, the document was then put back into the safe.

Lawrence Dale Gasteiger, an examiner of questioned documents, testified in behalf of appellant that he first met him on June 11, 1947. That he had examined various exhibits introduced into evidence, some of which contained the admittedly genuine signatures of decedent Clarence Clark and appellant. That it was his opinion that the signature ''Clarence Clark'' on the will, and the signature ''Clarence Clark'' on the employment contract are in the handwriting of the individual who wrote the signatures on the exemplars which were submitted to the witness as being those of decedent Clark. This witness expressed the further opinion that both signatures had been erased, but that the writing in pencil and the writing in ink were done by the same person. That on the will he could not find any evidence of attempted tracing. He saw graphite deposits on the paper on the entire area but that there was no single deposit such as would effect or give the appearance of a line. That the same condition applied to the employment contract. He could not state whether the erasing was before or after the inking in of the signatures. The witness also gave the reasons for his conclusions.

Lawrence J. Buys, an examiner and photographer of questioned documents, testified that he had examined the will and employment contract and the exemplar genuine signatures of Clarence Clark. That he also obtained exemplars of appellant's genuine signature from himself. That with respect to the signatures ''Clarence Clark'' on the will and employment contract he had reached the conclusion that as to the will, the ink signature ''Clarence Clark'' is an inked in signature from a pencil signature outlined already on the paper. That an erasure had occurred on the area then occupied by the ink signature and that most of the pencil outline was removed by an erasure, the pencil writing was put on, then the pencil writing was inked over and that then an erasure was made of that area. Referring to the employment contract, the witness gave it as his opinion that the pencil signature was first placed on the area now occupied by the ink signature; that the pencil signature was converted into an ink signature by following the pencil outline and that the erasure in this instance was after the ink signature was placed thereon. This witness testified that in his opinion there was no basis in fact from a comparison in the handwriting of appellant and the two questioned signatures on the will and contract to show in any

degree whatever that appellant wrote them. That the admittedly genuine signature of Clarence Clark is completely in conformity with the letter formation of the signatures on the will and contract. It was the opinion of this witness that appellant did not forge the signatures on the will and contract. The witness outlined at some length his reasons for the conclusions at which he had arrived.

In support of his first ground of appeal, it is earnestly urged by appellant that count II of the information (forgery) does not state facts sufficient to constitute a public offense.

The charging part of the challenged count is as follows:

"For a further and separate cause of action, being a different offense of the same class of crimes and offenses as the charge set forth in Count I hereof, and connected in its commission, the said MARTIN E. GEIBEL is accused by the District Attorney of and for the County of Los Angeles, State of California, by this information, of the crime of FORGERY, a felony, committed as follows: That the said MARTIN E. GEIBEL, on or about the 14th day of October, 1946, at and in the County of Los Angeles, State of California, with intent then and there to cheat and defraud, did then and there willfully, unlawfully, fraudulently and feloniously make, forge and counterfeit a certain Last Will and Testament and did then and there utter, publish and pass the same, knowing that said Will was false, forged and counterfeited, as aforesaid, with intent then and there to cheat and defraud, as aforesaid."

It is appellant's contention that the provisions of section 470 of the Penal Code, which defines the crime of forgery, definitely require that the false making and forging of a document, and the uttering, publishing or passing of the same, must be done with the intent to prejudice, damage or defraud some particular person. Appellant concedes that the charging part of the count in question may consist, as it were, of two branches, that is, the making and forging of the will, and the uttering and publishing of the same with intent to defraud, but insists that the pleading is fatally defective unless it be charged that the defendant forged the will and published it as true and genuine with intent to prejudice, damage or defraud some particular person.

We are persuaded that the allegations of count II are sufficient to state a public offense. The alleged counterfeited handwriting here in question was of such a nature that at least someone might possibly be defrauded or deceived by it, and

the allegations set forth that it was prepared and published with intent to deceive and defraud. We have been so prone to think of forgery as defined and denounced in our Penal Code as being an act designed to injure an individual or set of individuals that it is not surprising appellant has indulged in this fallacious assumption. In volume 2, Bishop's New Criminal Law, section 531, is the following pertinent language: "If forgery when prejudicial to an individual, is indictable, *a fortiori* it may be when tending to the harm of many or the public. Indeed, this is the kind of common-law forgery mostly spoken of in the older books." The author then lists among the examples alteration of a matter of record "or any other authentic matter of a public nature." We entertain no doubt that the allegations of count II of the information state a public offense. It is at once apparent that forgery of a will or all of the heirs at law of a decedent. It is not necessary might well have the effect of prejudicing or defrauding any to allege that the appellant was benefited or that any particular person was defrauded. It is sufficient if the forged instrument could possibly have had that effect. When one either makes or passes a false instrument with intent on his part to defraud the crime of forgery is complete (*People* v. *Davidian,* 20 Cal.App.2d 720, 724 [67 P.2d 1085]).

Furthermore, that the rules of pleading with reference to criminal charges have been liberalized by the amendments of 1927 and 1929 relating to pleading in criminal cases is not now open to question. Since these amendments the rule is that the purpose of an indictment or an information is to inform the accused of the charge which he must meet at the trial. When a pleading in a criminal case gives the accused notice of the offense of which he is charged it is sufficient. The particular circumstances and details thereof are furnished him by the transcript of the testimony upon which the indictment or information is predicated (Pen. Code, §§ 952, 959, 960, 870, 925). Count II of the information herein informed the appellant that he was charged with making, uttering and publishing as true and genuine the alleged forged will of decedent Clark with the intent thereby to cheat and defraud. No substantial right of appellant was prejudiced upon the merits. Count II therefore stated a public offense and the motion made in arrest of judgment thereon was properly denied (*People* v. *Pierce,* 14 Cal.2d 639, 644, 645, 646 [96 P.2d 784]; *People* v. *Yant,* 26 Cal.App.2d 725, 730 [80 P.2d 506]; *People* v. *Brac,* 73 Cal.App.2d 629, 634, 635 [167

P.2d 535] ; *People* v. *Codina,* 30 Cal.2d 356, 358, 359 [181 P.2d 881]).

█ In support of his claim that the evidence is insufficient to support the verdicts and judgments rendered, appellant urges that there is in the record no substantial evidence to prove that the will and contract are false and forged instruments as charged in count II of the information. It would unduly prolong this opinion to here again narrate in detail the evidence which we have hereinbefore set forth. Suffice it to say, there was evidence that decedent did not sign the name ''Clarence Clark'' on either the will or the employment contract. Concededly, the handwriting on the will down to the signature was that of appellant. There was evidence that the contract was all typed on an Underwood typewriter in one operation with the exception of the signatures, of course, and that the typewriter upon which the instrument was typed was not in existence at the time the contract was dated. There was expert testimony that while the expert witness could not find sufficient evidence from his examination to state whether or not appellant forged the signatures, he could have because, in the opinion of the expert witness, there was a similarity between the handwriting of appellant and the handwriting of the questioned signatures. There is also direct and positive evidence that appellant was in possession of both the will and contract until the will was filed for probate and until the contract was introduced into evidence in the matter of the estate of Clarence Clark, *ante,* on February 28, 1947. Other circumstances which could have been considered by the jury are that the will in question recites that the decedent had no debts or obligations other than those he owed appellant as his attorney since the death of the former's mother, and the testamentary document directed that appellant be paid out of the assets of the estate for his time-to-time services. Then again, the contract provides for the payment of $50 annually to appellant, beginning on or prior to February 4, 1924, and for further sums if the $50 payments were deemed inadequate. In this regard, appellant testified that he kept no record of payments made to him nor did he render decedent Clark any statement or demand for such fees, which he believed to amount to from $4,000 to $4,400 on February 10, 1944. And that from 1928 to 1944, decedent never paid appellant any of the annual $50 retainer fees.

█ The crime of forging a will is complete when the

document has been so prepared that upon its face it will have the effect of defrauding one who acts upon it as genuine (*People* v. *Horowitz*, 70 Cal.App.2d 675, 686, 687 [161 P.2d 833]). ■ Knowingly tendering a forged will for probate is an uttering thereof (*People* v. *Driggs*, 14 Cal.App. 507, 509 [112 P. 577]). ■ While intent to defraud is of the essence of forgery, the question of intent was one primarily for the jury (*People* v. *Horowitz, supra,* p. 687). ■ We find competent evidence in the record to the effect that the signature to the will and the contract was not that of Clarence Clark, the purported testator—by experts, it is true, but competent. There is in the record evidence of circumstances which belie the assumption that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below that appellant attached the forged signatures. ■ It is true that appellant presented direct evidence to disprove the opinions expressed by certain expert witnesses and to negative inferences unfavorable to him which could be drawn from circumstances in evidence and heretofore alluded to. Such evidence, however, merely created a substantial conflict and the determination thereof by the jury is controlling. To appraise the weight of the evidence is the function of the jury, while ours is to appraise its legal value. That under the circumstances here present an inference of innocence might reasonably have been drawn does not justify us in upsetting the verdicts of the jury. Between the two inferences that might be drawn, the jury must choose. Before we are authorized to disturb the conclusion arrived at by the constituted arbiters of the facts it must be clearly made to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached by them. Were the rule otherwise it would make this court the arbiter of both law and fact. Being unable to say that the inference of guilt drawn from the evidence by the jury was wholly unwarranted as a matter of law, we are powerless to interfere (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]). The case of *People* v. *Holt,* 25 Cal.2d 59, 69, 70 [153 P.2d 21], relied upon by appellant, does not militate against the foregoing rule in the light of the facts and circumstances present in the instant case.

■ Appellant argues that a vital defect in the evidence to prove that the signatures on the will and contract are forgeries is the failure of proof that appellant or any other person who

allegedly attached such signatures, did so without authority of decedent Clarence Clark. This contention is without merit. Appellant himself as well as his secretary Miss Silber definitely testified that they saw Clarence Clark sign both instruments, and in the case of the will appellant himself admittedly was one of the subscribing witnesses.

Before proceeding to additional discussion of the claim that the evidence is insufficient to sustain the verdicts and judgments under counts I and III, we shall dispose of appellant's contention that count II, charging the crime of forgery, was barred by the statute of limitations (Pen. Code, § 800). The code section just cited provides that in a case such as the one at bar, an indictment or information must be filed within three years after the alleged commission of the offense. Count II of the information herein alleged that the will in question was forged on or about October 14, 1946. The testamentary document is dated February 10, 1944, and the information was filed on October 9, 1947.

 Because the statute of limitations is jurisdictional, it follows that a prosecution within the statutory period specified is an essential element of the offense. A general verdict of guilty as charged, therefore, necessarily includes a finding on this element as it does in reference to the other elements of the offense.

 Appellant's contention that count II fails to state a public offense because the instrument alleged to have been forged is set out therein and bears date of February 10, 1944, is without merit. The statute begins to run from the actual date of the forgery and not from the date of the instrument. As was said in *People* v. *McPherson*, 6 Cal.App. 266, 269 [91 P. 1098]:

''Equally untenable is the position taken by appellant upon the oral presentation of the case. The crime is alleged by the information to have been committed on or about the seventh day of June, 1906. The instrument said to have been forged is set out in the information *in extenso* and bears date of March 18, 1889. It is urged that the prosecution is barred by the statute of limitations, because the information was not filed within three years after the date of the deed. In other words, the contention is made that by judiciously dating the forged instrument more than three years prior to its utterance the forger may protect himself from prosecution for the crime. To state the proposition is sufficient reason for refusing to

adopt it. For the purpose of testing the sufficiency of the information the date of the alleged commission of the offense (June 7, 1906) alone can be considered, and the date of the forged instrument is immaterial.''

Appellant urges that there is no evidence in the record upon which the jury could base its decision as to the date of forgery other than the presumption that the writing was truly dated (Code Civ. Proc., § 1963, subd. 23). This, however, is a rebuttable, not a conclusive presumption and may be controverted by other evidence, direct or indirect (Code Civ. Proc., § 1961). In the case now engaging our attention, the jury had before it the testimony of the appellant himself and of two corroborating witnesses that the instrument had been in his possession up to the time it was filed in the office of the county clerk on October 14, 1946. ''The possession of an instrument recently forged, by one claiming under it, like the possession of goods recently stolen, is evidence against the possessor'' (*People* v. *Smith,* 103 Cal. 563, 566 [37 P. 516]). There was also evidence that the testator Clark did not die until about March 4, 1946, justifying an inference that the forgery was committed after the demise of the alleged maker of the testamentary document. This we say because there was before the jury evidence given by appellant and his corroborating witnesses that on March 6, 1945, decedent Clark visited appellant's law office and examined the will. Obviously, no forgery had occurred prior to that time. All of this evidence was sufficient upon which to base an inference (Code Civ. Proc., §§ 1958, 1960), and consequent conclusion that the forgery was committed within three years prior to the filing of the information. The motion to dismiss count II of the information was, therefore, without merit.

We come now to a consideration of appellant's claim that the evidence is insufficient to sustain the verdict and judgment on count I which charged him with a violation of section 115 of the Penal Code, in that he offered for filing a false and forged instrument (the will). The section under which appellant was charged in count I does not require that the act must be done with the intent to defraud another, nor is there any provision therein requiring that anyone be defrauded thereby. In this it differs from many other sections of the same code relating to forgery. The crime of violating section 115 of the Penal Code is sufficiently proven when it

is shown that the accused intentionally committed the forbidden act.

There is evidence in the record that the will was forged and that appellant had possession of the same. That the instrument was filed for probate in the office of the county clerk on October 14, 1946. That a fee of $7.00 was paid for such filing. That a receipt for said filing fee was issued in the name of appellant whose name was obtained from the document filed. That when the petition for admission of the will to probate was filed and came on for hearing, appellant appeared as one of counsel for the petitioner therein. That at such hearing appellant identified the document as the last will and testament of decedent Clark and testified to the circumstances surrounding the execution thereof. These and other circumstances hereinbefore narrated lead us to the conclusion that the evidence was sufficient to establish a violation of the code section under which appellant was charged in count I, and is sufficient in law to sustain the judgment of conviction thereon. Whether the document was actually filed with the county clerk by appellant himself or at his behest is immaterial. In either event, the offense is complete.

In urging a reversal of the judgment of conviction on count III which charges a violation of section 132 of the Penal Code, offering in evidence a false document, appellant insists that the offering of a false will for probate does not offend against the provisions of section 132 of the Penal Code which uses the words "*offers in evidence,* as genuine or true, any . . . document . . . in writing, knowing the same to have been forged. . . ." (Emphasis added.) Appellant poses the question, "At a hearing where a will is presented for probate, is it offered in evidence or is it just offered for probate?" Appellant's query is answered by *People* v. *Horowitz, supra,* page 688, wherein it is stated: "Similarly does appellant stand legally convicted of offering in evidence the forged instrument. He offered it for probate. He defended a contest filed by Morris. He knowingly offered the forged instrument in evidence, the crime denounced by section 132."

In the instant case there is evidence that the will was offered for probate by appellant or at his behest, and at the hearing on the petition for admission to probate of the will, appellant appeared not only as one of the attorneys for the petitioner, but there testified as to the execution of the will and the genuineness of the disputed signature of the testator.

The document was examined by the court, and was the subject of expert testimony and legal argument. We are persuaded that such use of the instrument constitutes an offering in evidence within the meaning of the code section (*People* v. *Hooper*, 10 Cal.App.2d 332, 334 [51 P.2d 1131]), and that the evidence was, therefore, sufficient to support the verdict and judgment on count III.

Appellant's claim that the evidence taken as a whole was insufficient to warrant the conclusion by the jury that the will and contract of employment were forgeries is answered by what we have hereinbefore said in considering appellant's contention that the record was barren of sufficient substantial evidence to support the verdict and judgment of conviction on count II. It is true, as stated by appellant, with reference to the genuineness of the signature on the contract, that proof of acknowledgment by a notary public is prima facie evidence of the execution of the writing, but such a showing is rebuttable and not conclusive. In the case at bar, Mrs. Berg, the notary, could not testify to the identity of the individual whose acknowledgment she took except that she had been introduced to him as Clarence Clark by appellant. While she testified as to the general appearance of the individual, his approximate age and dress, there was expert testimony by handwriting experts that decedent Clark did not sign the contract, and there was positive testimony that it was typed on a typewriter which was not in existence on the date of said contract. A certificate of acknowledgment being only prima facie evidence, such certificate may be contradicted by other evidence direct or indirect (Code Civ. Proc., § 1833; *Moore* v. *Hopkins*, 83 Cal. 270, 271, 272 [23 P. 318, 17 Am.St.Rep. 248]; *Le Mesnager* v. *Hamilton*, 101 Cal. 532, 534, 538 [35 P. 1054, 40 Am.St.Rep. 81]; *Courtney* v. *Daniel*, 124 Okla. 46 [253 P. 990, 995, 996]). The evidence was sufficient to justify the jury in concluding that notwithstanding the notarial acknowledgment thereon, the contract was not signed by Clarence Clark. We are not unmindful of the earnestness and zeal with which appellant presents his arguments as to the insufficiency of the evidence in this cause. Concededly, there is a sharp and direct conflict in practically every phase of the evidence, not only as to the surrounding circumstances of the execution of the will and contract, but as to the opinions of the expert witnesses, but the jury, as was their right, have resolved these differences against appel-

lant. For reasons heretofore stated, we cannot, under the factual situation here present, disturb the conclusion at which the constitutional and statutory arbiters of the facts have arrived.

We are now confronted with appellant's contention that the court committed prejudicial error in certain rulings made during the course of the trial. In this regard, appellant first predicates error on the ruling of the court in striking out the answer given by Lawrence J. Buys, a handwriting expert testifying for appellant. The question was asked him on cross-examination by the district attorney when the witness was examining an exhibit made by Clark Sellers, a handwriting expert witness for the prosecution, which was introduced into evidence. The following occurred:

"A. Yes. I see that comparison, method of comparison.

"Q. What is that?

"A. I see that method of comparison as presented by this chart, yes.

"Q. Now, in examining those letters taken from the body of the will as depicted in that exhibit, you do not see any considerable tremor, do you?

"A. No, I do not. I think that chart is a completely unfair type of selection and comparison of this problem.

"MR. CRAIL (Deputy District Attorney): May that be stricken as a conclusion of the witness?

"MR. MCMAHON (Counsel for Appellant): He is an expert.

"THE COURT: The motion to strike is granted."

Appellant cites no authority in support of his claim that the ruling was erroneous and we are satisfied of its correctness. That part of the answer, "No, I do not." was proper and responsive to the interrogatory propounded. The remainder of the answer did not embody an opinion on questions in controversy at the trial and amounted only to a criticism of the methods used by another expert witness. The last quoted portion of the answer was not responsive to the question and could properly have been stricken on that ground (Code Civ. Proc., § 2056). Nor do we perceive any prejudice to appellant's substantial rights from the ruling.

It is next contended by appellant that the trial court committed prejudicial error in overruling his objection to a question asked of him by the district attorney and in requiring appellant on cross-examination to answer the same. In that regard the record reflects the following:

"Q. Mr. Geibel, you stated this morning you had been representing Mr. Clarence Clark as an attorney from 1923 to the date of his death, approximately. Is that statement entirely true?

"A. All of that period I represented him for legal services and other services, but I didn't perform any legal services beginning September 5, 1939 up to September 5, 1940; I was out of the state.

"Q. Is that the only reason you didn't render any services for him as attorney during that period of time?

"A. As far as I know, it was.

"Q. Isn't it a fact that during that period of time you were suspended from practicing law in the State of California by the Supreme Court of this state?

"MR. McMAHON: That is objected to, incompetent, irrelevant and immaterial, has no bearing on any of the issues of this case.

"THE COURT: In view of the last answer, the objection is overruled. You may answer the question.

"A. I was."

With commendable candor the attorney general states in his brief that "While respondent will concede for the purpose of argument that it would have been better had the question never been asked," he still insists that the asking of the question "was perfectly proper cross-examination and impeachment and the ruling of the court was correct." We agree with respondent that "it would have been better had the question never been asked," and furthermore, definitely say that it should not have been asked. The ruling of the court was manifestly erroneous. We so held with reference to the asking of this question in the probate proceedings which gave rise to this prosecution (*Estate of Clark, ante,* p. 110), but concluded it was not prejudicial because that proceeding was one before the court without a jury, and that the trained mind of the judge would not be prejudicially affected by the challenged testimony and would be considered by him only for what he conceived to be the limited purpose of cross-examination on the issue of whether appellant herein had, so far as that proceeding was concerned, rendered services for the decedent Clark continuously over a stated period of years. Here, however, we are concerned with a trial by jury, and as was said in *People* v. *Albertson,* 23 Cal.2d 550, 577 [145 P.2d 7] (quoting from Wharton's Criminal Evidence § 360, p. 567), " 'It does not reflect in any degree upon the

intelligence, integrity, or the honesty of purpose of the juror that matters of a prejudicial character find a permanent lodgment in his mind, which will, inadvertently and unconsciously, enter into and affect his verdict. The juror does not possess that trained and disciplined mind which enables him either closely or judicially to discriminate between that which he is permitted to consider and that which he is not. Because of this lack of training, he is unable to draw conclusions entirely uninfluenced by the irrelevant prejudicial matters within his knowledge. . . .' "

The question was not proper cross-examination and the answer sought did not prove, nor tend to prove, any issue in the instant case. Unless the evidence sought to be elicited is relevant and material to the ultimate issue involved in the trial, the law does not sanction the introduction of evidence falling short of a felony and designed merely to degrade and prejudice the accused in the mind of the jury. What bearing upon the issues of the trial was contained in the question as to whether appellant had been previously suspended from the practice of law in this state? Respondent seeks to answer this question with the statement that on his direct examination appellant "attempted to build up in the minds of the jury, by his own testimony, his character, honor and trustworthiness" as an "honorable, honest, experienced attorney who had the interests of his client at heart, no larceny in his mind and no fraud in his make-up." We have read the entire record in this case, consisting as it does in part of a reporter's transcript containing more than 800 pages, a clerk's transcript of 91 pages, and manifold exhibits, and fail to find therein any material issue in the determination of which the challenged question and answer were helpful. Under the limitations of the rule applicable to the cross-examination of a defendant in criminal cases (*People* v. *Gilliland*, 39 Cal.App.2d 250, 260 [103 P.2d 179]) it was error to permit the challenged interrogatory to be propounded to appellant on cross-examination. It is too well settled to require the citation of authorities that, upon the trial of one accused of a crime, evidence of other specific wrongful acts not pertinent to the issue on trial is not admissible; and, also, that a witness cannot be impeached by evidence of particular wrongful actions, except that it may be shown that he has been convicted of a felony. It would be an impeachment of the legal learning of counsel for the People to intimate that he did not know the aforesaid question and

the answer sought thereto were improper and peculiarly calculated to prejudice the substantial rights of appellant. That the asking of the question was prejudicial there can be little doubt. It would ignore human experience and belie the dictates of common sense to entertain a contrary view. What was said by the Chief Justice of the United States Supreme Court in the case of *Vierick* v. *United States,* 318 U.S. 236 [63 S.Ct. 561, 87 L.Ed. 734], quoting from *Berger* v. *United States,* 295 U.S. 78, 88 [55 S.Ct. 629, 79 L.Ed. 1314, 1321], reflects our views as to the duties and obligations of a prosecuting officer. We quote: ''The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.''

▪ ▄▄▄ Appellant predicates prejudicial error on the ruling of the court refusing to allow him to prove, in particular, what legal services he had rendered to decedent Clarence Clark, as a basis for establishing the verity of his claim against the estate of said Clark.

A creditor's claim in the amount of $4,472 filed by appellant in the Clark estate for legal services rendered the decedent during the latter's lifetime was introduced into evidence by the prosecution. Manifestly, the only purpose for introducing this creditor's claim was that it tended in some way to prove an intent upon appellant's part to defraud. During the direct examination of appellant his counsel directed his attention to the exhibit in question (the creditor's claim) and inquired, ''I will ask you if you rendered the services, legal services, referred to in that claim?'' to which appellant responded, ''I did.'' Objection was made on the ground that it was ''immaterial whether he did or didn't.'' After considerable discussion, much of which took place outside the presence of the jury, the district attorney, upon resumption of proceedings in the presence of the jury stated: ''Before we get rid

of this reporter—I mean, before he leaves us, I move to strike the last answer that was given by the witness and insert the objection that was stated to the Court at the bench. THE COURT: The motion is granted.''

The ruling was erroneous. As to count II of the information, the prosecution was required to prove appellant's specific ''intent to defraud.'' It follows as a matter of course that appellant was entitled to rebut or controvert any of the evidence that tended to establish such alleged intent. It would be a poor exemplification of the administration of even-handed justice to allow the prosecution by the introduction of evidence to prove specific intent on the part of an accused in the alleged commission by him of a criminal offense, and in the same action to deny the accused an equal privilege to rebut or controvert such evidence by showing his lack of criminal intent (*People* v. *Becker,* 137 Cal.App. 349, 352 [30 P.2d 562]).

Appellant has abandoned the contentions made by him under his point VII relative to rulings of the court made during the direct and cross-examination of one of his handwriting experts.

 Appellant complains that the court erred in overruling his objection to the introduction into evidence of the superior court file in the aforesaid probate proceeding (*Estate of Clark, ante*), in which appellant acted as counsel and testified as a subscribing witness to the proffered will. Without citation of authority appellant argues that the file in question was hearsay and that no proper foundation was laid for its introduction. The claim is without merit and cannot be sustained. The documents contained in the file were originals, identified by a deputy county clerk who testified he obtained them from the court files in his office. Such foundation was sufficient under the provisions of section 1905 of the Code of Civil Procedure.

 The next ruling to which appellant excepts occurred during the direct examination of Clark Sellers, called by the prosecution as a handwriting expert. While the district attorney was qualifying the witness as an examiner of questioned documents, the following occurred:

''Q. Now, I recall the Lindbergh kidnapping case, known as the Hauptman case. Did you take part in that trial?

''A. Yes. I was asked by the Attorney General of New Jersey to examine the letters written to Colonel Lindbergh and to Mr. Condon, to determine whether or not in my opinion

Mr. Hauptman wrote those letters, and I made a report to him and was called as a witness in behalf of the State and testified in that case.

"Q. By the way, how many handwriting experts testified for the prosecution in that case, do you recall?

"MR. MCMAHON: Object to that as incompetent, irrelevant and immaterial.

"THE COURT: The objection will be overruled.

"A. Eight for the prosecution."

We perceive no error, certainly not reversible error in the ruling. The examination of an expert witness as to his qualifications and competency before he gives his opinion is a question of procedure which lies within the discretionary power of the trial court. Unless there is an obvious abuse of discretion an appellate tribunal will not interfere with the ruling. No such situation is here presented.

Appellant has abandoned his contention as contained in point IX with respect to further claimed prejudicial misconduct of the district attorney during the trial and in his argument to the jury, other than that already set forth herein and discussed.

 Appellant complains that the trial court did not give to the jury any instructions requested by him. It is not incumbent upon the court to give any particular instructions offered by either the prosecution or the defense. It is sufficient if the jury is fully, fairly and correctly instructed on the law applicable to the issues tendered by the indictment or information, or raised by the evidence. And the rule is too well established to require the citation of authorities, that it is not error to refuse a requested instruction if it has been covered by those already given.

We shall now give consideration to appellant's contention that the court erred in giving certain instructions. In this regard appellant asserts prejudicial error in the giving of the following instructions:

"In every crime or public offense there must exist a union or joint operation of act and intent. To constitute criminal intent it is merely necessary that a person inten*t* to do an act which, if committed, will constitute a crime. When a person intentionally does that which the law declares to be a crime, such person is acting with criminal intent even though he may not know that such act is unlawful and even though there be no bad motive."

Respondent concedes that had appellant been charged only with the crime of forgery (count II) his contention would be meritorious, but asserts that appellant was also charged in counts I and III with violations of sections 115 and 132 of the Penal Code, to which offenses the instruction complained of is clearly applicable. There can be no question but that in the offenses charged in counts I and III the intent is not made an affirmative element of the crimes, and the law presumes that the act, if knowingly done, was done with a criminal intent. However, the vice of the challenged instruction lies in the fact that it was not limited to the offenses charged in counts I and III.

The same criticism is applicable to the following instruction:

"The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act or make the omission referred to. It does not require any intent to violate law or to injure another, or to acquire any advantage."

True, the court did give an instruction as follows:

"In the case of certain crimes it is necessary that in addition to the intended act which characterizes the offense, the act must be accompanied by a specific or particular intent without which such a crime may not be committed.

"Thus in the crime of *forgery,* a necessary element is the existence in the mind of the perpetrator of the specific intent to *defraud,* and unless such intent so exists that crime is not committed."

However, it cannot be said that the giving of the last named correct instruction on specific intent overcame the prejudicial effect of the erroneous instruction as to count II. At most it created a conflict and normally would serve only to confuse or mislead the jurors and make it impossible to determine whether, in their deliberations, they followed the law as correctly or incorrectly given to them (*People* v. *Maciel,* 71 Cal. App. 213, 217 [234 P. 877] ; *People* v. *Richardson,* 161 Cal. 552, 564 [120 P. 20] ; *People* v. *Miller,* 2 Cal.2d 527, 532 [42 P.2d 308] ; *People* v. *Gibson,* 107 Cal.App. 76, 82 [289 P. 937] ).

■ The court gave the following instruction on the question of aiding and abetting the commission of a crime:

"All persons concerned in the commission of a crime who either directly and actively commit the act constituting the offense or who knowingly and with criminal intent aid and abet in its commission or, whether present or not, who advise

and encourage its commission, are regarded by the law as principals in the crime thus committed and are equally guilty thereof.

''(One who does not actively commit the offense, but who aids, promotes, or encourages its commission either by act or counsel or both, is not deemed by law to be guilty and shall not be found guilty of the crime unless he did what he did knowingly and with criminal intent. To abet another in the commission of a crime implies a consciousness of guilt in instigating, encouraging, promoting, or aiding the commission of such criminal offense.)''

Appellant's contention that this instruction should not have been given must be sustained. The instruction is substantially in the language of section 31 of the Penal Code, and of course states the law correctly, but under the circumstances of this case it should not have been read to the jury. The necessary implication from this instruction, in the light of the situation as it was developed by the evidence, was that there was evidence tending to show that the claimed forgery of the will (count II and the offenses charged in counts I and III were the result of the joint acts of appellant and others. Save and except for the fact that appellant and his secretary, Miss Silber, were subscribing witnesses to the will, there is not the slightest evidence to establish a confederation between appellant and any other persons for the purpose of committing the offenses charged in the information. The trial court is required by section 1127 of the Penal Code to refuse to give all requested instructions not pertinent. To give instructions not pertinent to the issues involved tends only to confuse the jury, and instead of enlightening them, serves to impede the administration of justice (*People* v. *Silva,* 48 Cal.App. 728, 738 [192 P. 330]; *People* v. *Adams,* 79 Cal.App. 373, 377 [249 P. 536]).

 What we have just said applies with equal force to the instruction:

"Evidence, if any, that the (a) defendant, on one or more occasions other than from the witness stand, made false, contradictory or misleading statements concerning the charge against him which now is being tried (*or that he endeavored to procure false or fabricated evidence to be produced at the trial*) may be considered by the jury as a circumstance tending to prove a consciousness of guilt, but is not sufficient of itself to prove guilt. The weight to be given to such a circumstance, and the significance, if any, to be attached to it, are matters for the jury to determine." (Emphasis added.)

There was no evidence introduced at the trial that proved or tended to prove, or from which a fair or reasonable conclusion or inference could be drawn by the jury that appellant "endeavored to procure false or fabricated evidence to be produced at the trial." It therefore manifestly follows, that the instruction should not have been given.

We have considered but find no merit in appellant's further complaint as to certain other instructions given or refused.

Finally, we come to a consideration of respondent's contention that assuming the district attorney was guilty of misconduct and that certain rulings of the court were prejudicial, nevertheless, "in view of the obvious guilt of the defendant as is shown by the facts, the misconduct nor any prejudicial ruling of the court are such as would warrant this court, in reversing the judgment on these grounds (Cal. Const., Art. VI, Sec. 4½)." With the reasoning of the learned attorney general that the saving grace of section 4½ of article VI of the state Constitution should come to the rescue of these convictions, we are not in accord. As was said by this court in *People* v. *Braun,* 31 Cal.App.2d 593, 603 [88 P.2d 728] :

"Illegitimate and unconstitutional practices get their first footing by silent approaches and slight deviations from established legal modes of procedure. In a strong dissenting opinion delivered by Mr. Justice Sutherland of the Supreme Court of the United States, in *Associated Press* v. *National Labor Relations Board,* 301 U.S. 103 [57 S.Ct. 650, 81 L.Ed. 953], we are counseled to 'withstand all beginnings of encroachment. For the saddest epitaph which can be carved in memory of a vanished liberty is that it was lost because its possessors failed to stretch forth a saving hand while yet there was time.' The acquittal of a guilty person is truly a miscarriage of justice, but the conviction of an innocent person through relaxation of those fundamental legal principles such as the one with which we are here concerned, would be a tragedy. It is the duty of the courts to be watchful for the constitutional and individual rights of the citizen and against any stealthy encroachments thereon."

In the case at bar the evidence is in sharp conflict. All the material facts testified to by witnesses for the prosecution were denied and controverted. The language used by this court in *People* v. *Gilliland, supra,* pages 264, 265, we consider is applicable to and determinative of respondent's claim that the general evidence is sufficient to put into operation the

saving grace of section 4½ of article VI of our state Constitution. We quote:

"We do not understand section 4½ of article VI of the Constitution as intended to mean that merely because the evidence may legally be able to stand up under the weight of the judgment, that is sufficient reason in all cases for refusing to set aside the judgment. (*People* v. *Davis,* 210 Cal. 540, 556 [293 P. 32].) The phrase 'miscarriage of justice' as used in the constitutional provision has no hard or fast definition, and as was said in *People* v. *Wilson,* 23 Cal.App. 513 [138 P. 971], 'does not merely mean that a guilty man has escaped or that an innocent man has been convicted. It is equally applicable to cases where the acquittal or conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied. The right of the accused, in a given case, to a fair trial, conducted substantially according to law, is at the same time the right of all inhabitants of the country to protection against procedure which might at some time deprive them of life or liberty. ''It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure in which the substantial rights belonging to the defendant shall be respected.'' '

"If a defendant cannot be fairly convicted, he should not be convicted at all; to hold otherwise would be to provide ways and means for the conviction of the innocent. It cannot be gainsaid that you cannot inspire or preserve respect for the law by withholding its protection from those accused of crime. While deviation from the prescribed rules of law governing trial may result in justice for the particular defendant who is before the bar, it is dangerous to the community and its citizens. As was said by Chief Justice Hughes of the United States Supreme Court not so long ago, 'In our system, the individual finds security in his rights because he is entitled to the protection of tribunals that represent the capacity of the community for impartial judgment as free as possible from the passion of the moment and the demands of interest or privilege.' When, as here, we are unable to say 'whether appellants would or would not have been convicted but for the errors of the court, we must direct a reversal.' (*People* v. *Degnen,* 70 Cal.App. 567 [234 P. 129].) We do not regard the evidence in this case as sufficient to put into operation the saving grace of section 4½ of article VI of the Constitution. Even convincing proof of a defendant's guilt does not

necessarily mean, under all circumstances, that there has been no miscarriage of justice. (*People* v. *Mahoney*, 201 Cal. 618 [258 P. 607]; *People* v. *Patubo*, 9 Cal.2d 537 [71 P.2d 270, 113 A.L.R. 1303].) From our examination of the record in this case we are of the opinion that the errors complained of have resulted in a miscarriage of justice. It is quite likely that the conviction of appellant was caused by the errors that are shown by the record. From the standpoint of the prosecution, the most that can be said is that the evidence as a whole which was legally admissible was quite evenly balanced. In venturing these observations, we speak only from the showing made by the record. It is true the jury had an opportunity to observe the demeanor of the witnesses and may have had reason to return the verdicts which were found irrespective of the errors which were committed during the trial. As to this, of course, we can say nothing. From the mere record, as we read it, the errors may very easily have turned the scale in favor of the prosecution. Appellants were denied that fair and impartial trial guaranteed by law, which amounts to a denial of due process of law. (*Powell* v. *Alabama*, 287 U.S. 45, 52 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527].)'' (See, also, *People* v. *Duvernay*, 43 Cal.App.2d 823, 829 [111 P.2d 659] and *People* v. *Hooper*, 92 Cal.App.2d 524, 530, 531 [207 P.2d 117].)

 Criminal cases should not be conducted with an eye to the saving grace of section 4½, article VI of the Constitution. Except in proceeding on motion for a new trial, the constitutional section is of no concern to the trial courts, and so far as its application goes, it is of interest only to the courts of review (*People* v. *Black*, 73 Cal.App. 13, 43 [238 P. 374]).

For the foregoing reasons, the judgments and the order denying defendant's motion for a new trial are, and each is reversed, and the cause remanded for a new trial.

Doran, J., and Drapeau, J., concurred.