[Crim. No. 9573.   Second Dist., Div. Four.   July 19, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. H. ROY STEELE et al., Defendants and Appellants.

Hoose, Perry & Hartman, Harned Pettus Hoose, Ronald K. Perry, Ronald L. Hartman and Charles E. Whitesell for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Norman H. Sokolow, Deputy Attorney General, William B. McKesson and Evelle J. Younger, District Attorneys, and John E. Howard, Deputy District Attorney, for Plaintiff and Respondent.

KINGSLEY, J.—In an indictment returned by the Grand Jury of Los Angeles County, defendants were charged with one count of criminal conspiracy; 28 counts of grand theft, and six counts of violation of the corporate record keeping and corporate record accuracy provisions of the Corporations Code, section 3020.[1]

---

[1]In Count I, defendants were charged with committing the crime of conspiracy between May 15, 1959, and April 30, 1961, in that they agreed together and with others to misappropriate public funds (Pen. Code, § 424, subds. 1, 2 and 3); to commit grand theft (Pen. Code, §§ 484 and 487, subd. 1); to commit theft of corporate funds (Pen. Code, § 504); to

Count XXIII for grand theft was dismissed in the course of the trial upon motion of defendants. The jury found the defendants "not guilty" under Count VIII which was one of the grand theft counts. The defendants were found "guilty" as charged in all of the remaining counts of the indictment. Defendants' motions for new trial were denied and probation was denied.

The court sentenced defendants to imprisonment for the term prescribed by law on each count. Sentences on each count were ordered to run concurrently with each other except that the sentences as to Counts XXIV through XXXI were ordered to run concurrently with each other and consecutively to the other counts.

Notices of appeal were filed on behalf of each defendant from the judgments of conviction.

---

make false entries on corporate books, and to fail to make proper entries thereon (Corp. Code, § 3020, subds. (a) and (b)); to cheat and defraud, and to obtain money by false pretenses. Twenty-eight overt acts were alleged in pursuance thereof. These acts were relative to defendants' meeting with David Farrell, President of Los Angeles Trust Deed and Mortgage Exchange; to defendants creating certain corporations; to their causing trust deeds to be sold; to their causing bills to be submitted on behalf of certain corporations in certain amounts; to their negotiating a certain loan transaction, to their causing a public corporation to be formed, and accepting positions as officers and directors thereof; and to their engaging in certain financial transactions as officers and directors thereof.

In Counts II through VIII, defendants were charged with the crime of grand theft of money, the personal property of Los Angeles Trust Deed and Mortgage Exchange, and of a certain class of 302 trust deed holders. Specifically, defendants were charged in Count II with feloniously taking $10,000 on April 11, 1960; in Count III with feloniously taking $4,000 on April 22, 1960; in Count IV with feloniously taking $4,200 on May 4, 1960; in County V with feloniously taking $11,000 on May 16, 1960; in Count VI with feloniously taking $2,000 on May 25, 1960; in Count VII with feloniously taking $2,000 on June 7, 1960; and in Count VIII with feloniously taking $1,137.42 on June 2, 1960.

In Counts IX through XI defendants were charged with the crime of grand theft of money, the personal property of State Mutual Savings and Loan Association, of Embarcadero Ranchos, Inc., and of a certain class of 625 trust deed holders. Specifically, defendants were charged in Count IX with feloniously taking $310 on August 9, 1960; in Count X with feloniously taking $12,045 on September 30, 1960; and in Count XI with feloniously taking $2,000 on August 1, 1960.

In Counts XII and XIII, defendants were charged with the crime of grand theft of money, the personal property of Embarcadero Ranchos, Inc. Specifically, defendants were charged in Count XII with feloniously taking $7,764.63 on December 31, 1960; and in Count XIII with feloniously taking $551.76 on March 31, 1960.

In Counts XIV and XV, defendants were charged with violating Corporations Code, section 3020, subd. (a) in that they received and possessed themselves of the sums mentioned in Counts XII and XIII, re-

This case is basically concerned with the financing of two land development projects, one located in Santa Barbara County known as *The Embarcadero,* the other project located in Los Angeles County known as Bell Canyon.

## EMBARCADERO PROJECT

On July 31, 1959, Mr. H. Roy Steele and Mr. Irwin H. Harris, through a series of simultaneous conveyances of title in three escrow arrangements, one with Title Insurance and Trust Company in Santa Barbara, the remaining two with

spectively, on said dates as officers of said corporation, other than in payment of a just demand, and with intent to defraud, omitted to make a full and true entry of their possession of said property in the records of the corporation.

In Counts XVI through XVIII, defendants were charged with the crime of grand theft of money, the personal property of Los Angeles Trust Deed and Mortgage Exchange, of Embarcadero Ranchos, Inc., and of a certain class of 625 trust deed holders. Specifically, defendants were charged in Count XVI with feloniously taking $500 on October 29, 1959; in Count XVII with feloniously taking $1,000 on November 25, 1959; in Count XVIII with feloniously taking $675 on January 20, 1960.

In Count XIX, defendants were charged with committing, on June 6, 1960, the crime of grand theft of money, specifically $2,000, the personal property of Los Angeles Trust Deed and Mortgage Exchange, of Bell Canyon, Inc., and of a certain class of 302 trust deed holders.

In Count XX, defendants were charged with committing, on June 27, 1960, the crime of grand theft of money, specifically $2,500, the personal property of State Mutual Savings and Loan Association, of Embarcadero Ranchos, Inc., and of a certain class of 625 trust deed holders.

In Count XXI, defendants were charged with violating, on November 24, 1959, Corporations Code, section 3020, subd. (b), in that they knowingly made false entries in the records of Embarcadero Ranchos, Inc., relative to checks in the amounts of $528.80 and $1,300.

In Count XXII, defendants were similarly charged as in Count XXI, relative to a check in the amount of $2,000 on October 29, 1959.

In Count XXIII, defendants were charged with committing, on November 3, 1960, the crime of grand theft of money, specifically $2,000, the personal property of Embarcadero Ranchos, Inc., of Colonia Vista Properties, Inc., and of a certain class of 625 trust deed holders.

In Counts XXIV through XXXI, defendants were charged with committing the crime of grand theft of money, the personal property of Embarcadero Municipal Improvement District, of Embarcadero Ranchos, Inc., of State Mutual Savings and Loan Association, of a certain class of 625 trust deed holders, and of a certain class of general obligation bondholders. Specifically, defendants were charged in Count XXIV with feloniously taking $20,000 on April 10, 1961; in Count XXV with feloniously taking $10,000 on April 10, 1961; in Count XXVI with feloniously taking $5,000 on April 10, 1961; in Count XXVII with feloniously taking $9,000 on April 10, 1961; in Count XXVIII with feloniously taking $10,000 on April 10, 1961; in Count XXIX with feloniously taking $15,000 on April 12, 1961; in Count XXX with feloniously taking $10,000 on April 26, 1961; in Count XXXI with feloniously taking $15,000 on April 21, 1961.

In Counts XXXII and XXXIII defendants were charged with committing the crime of grand theft of money, the personal property of

the Union Bank in Beverly Hills, acquired title to approximately 1,400 acres of land—then known as the Tecolote Ranch and thereafter known as the Embarcadero Project—located in Santa Barbara County.

Title to the land was taken in the name of two corporate entities formed for this purpose—Embarcadero, Inc., and Embarcadero Ranchos, Inc. The purchase money necessary to finance this acquisition of the land was supplied by the Los Angeles Trust Deed and Mortgage Exchange (hereinafter referred to as L.A.T.D.). To secure the purchase money supplied by L.A.T.D., a portion of the 1,400 acre tract was subdivided into 632 individual lots, and trust deeds were created on each lot in varying amounts. The beneficial interests under these trust deeds were assigned to L.A.T.D. and thereafter L.A.T.D. released $1,159,618 by cashier's check through Union Bank escrow to pay for the land.

The face value of the 632 trust deeds thus acquired by L.A.T.D. was $2,307,700. In addition to the funds thus advanced through the escrow, L.A.T.D., as part of the purchase price of the 632 trust deeds, also established a withhold impound account of $536,763 for the credit of the Embarcadero Project. This withhold account, maintained at the office of L.A.T.D., allocated $285,375 for construction purposes in connection with the Embarcadero Project and $251,388 for interest payments on the trust deeds. The entire construction fund impound was withdrawn under control of a voucher system. This voucher system required that invoices for the work done on the Embarcadero Project be approved by the defendants and forwarded by them to L.A.T.D. approved for payment. On the receipt of the approved invoice, funds would be drawn from the construction impound for payment of the invoices.

Counts XVI, XVII, XVIII, XXI, and XXII of the indict-

Embarcadero Ranchos, Inc., of Los Angeles Trust Deed and Mortgage Exchange, and of a certain class of 625 trust deed holders. Specifically, defendants were charged in Count XXXII with feloniously taking $6,000 on September 22, 1960, and in Count XXXIII with feloniously taking $6,000 on November 7, 1960.

In Counts XXXIV and XXXV, defendants were charged with committing, on September 22, 1960, and November 7, 1960, respectively, the crime of violating Corporations Code, section 3020, subd. (a), in that they received and possessed themselves of the sum of $6,000 in each instance as officers of Embarcadero Ranchos, Inc., other than in payment of a just demand, and, with intent to defraud, omitted to make a full and true entry of their possession of said property in the records of the corporation.

ment are based on alleged fraudulent withdrawal of funds from this L.A.T.D. withhold account.

## A. LOS ANGELES TRUST DEED AND MORTGAGE EXCHANGE.

### 1. *Counts XVI, XVII, XVIII, XXI and XXII.*

The acts which form the basis of the alleged crimes charged in Counts XVI, XVII and XVIII involve the submission of invoices by an architectural firm (Ridgely and Wexler) to L.A.T.D. for sums in excess of those actually owed by the Embarcadero Project. These inflated invoices were prepared at the request of defendants and checks for the excess amounts were turned over to the defendants by Ridgely and Wexler.

The Embarcadero Ranchos' cash receipts and disbursement journal reflects the disbursement by Embarcadero Ranchos of the check to Ridgely and Wexler which forms the basis of Count XVII but fails to reflect any entry or notation of the monies returned by Ridgely and Wexler to defendants. This allegedly false entry on the corporate books forms the basis of Count XXI. The same book of account properly reflects the disbursement discussed in Count XVI, but fails to note or reflect the $500 return check to the defendants. This allegedly false entry on the corporate books forms the basis of Count XXII.

### 2. *Counts XXXII, XXXIII, XXXIV, and XXXV.*

The records of L.A.T.D. reflect that $40,000 was paid in September 1959 from the withhold account to purchase heavy construction equipment, including a tractor, for the Embarcadero Project. In September 1960 the tractor was sold to the Kirst Construction Company for $12,000. Payment, in the form of two $6,000 checks, was made by Kirst to defendants rather than to the corporation. This act forms the basis for Counts XXXII and XXXIII. Bank records reflect that both Kirst checks went into the private bank account of defendant Harris and that there was in each case a $3,000 check debit on the ledger sheet of defendant Harris, occurring the same day as to each deposit. These Kirst checks to defendants were not reflected in the books and records of Embarcadero Ranchos.

## B. STATE MUTUAL FINANCING.

In June 1960, defendants arranged a loan with State Mutual Savings for $1,106,900 for home construction and "offsite" improvements in connection with the Embarcadero

Project. Of the total loan, $257,500 was for "off-site" improvements in connection with the project. Security for the loan was the execution of 153 trust deeds on Embarcadero lots in favor of State Mutual. These first trust deeds were on lots previously encumbered with the L.A.T.D. financing, but this encumbering was possible because of subordination provisions for that purpose contained in the L.A.T.D. trust deeds. Payments under the loan were handled under a voucher system. Under this system, work upon completion would be invoiced to State Mutual by an Embarcadero Ranchos' voucher. Embarcadero Ranchos would pay the actual performer and thereafter realize collection by the voucher system from State Mutual. In other cases, the actual worker would bill State Mutual directly, who would pay the worker upon and after authorization by Embarcadero Ranchos. The purpose of the voucher system plus the periodic inspections of State Mutual was to insure that no false or inaccurate invoices were accepted and paid by State Mutual.

1. *Count IX.*

Robert Hoon, a paving contractor, performed certain repair work for defendant Harris at a tract of homes known as Better Community Homes, located in the San Fernando Valley and which had nothing to do with the Embarcadero Project. However, on August 17, 1960, State Mutual received an invoice from Embarcadero Ranchos which requested payment for work done on the Embarcadero Project by Hoon & Son. Testimony was given that Hoon & Son never performed work for the Embarcadero Project and that the payment made to Hoon & Son was actually for work done at Better Community Homes.

2. *Count X.*

In September 1960, a firm of concrete and framing contractors signed four vouchers reflecting work performed on the Embarcadero Project. The first was paid by State Mutual. The firm then returned the full amount by means of four checks to the Embarcadero Ranchos. Testimony was given that the work indicated on the vouchers had either been paid for previously or was fictitious work and that the vouchers had been prepared at the instructions of the defendants. The Bank of America records at the Goleta Branch show that the checks payable to Embarcadero Ranchos were deposited into Embarcadero Ranchos' account on October 6,

1961, and that on October 10 and 11, two checks, payable to defendants and covering part of the deposit of October 6, cleared the Embarcadero Ranchos' account and were paid against the above noted deposit.

### 3. *Count XI.*

On the approval of defendant Harris, a firm of civil engineers used by defendants to do work on the Embarcadero Project invoiced Embarcadero Ranchos for amounts in excess of work actually done. State Mutual paid the firm these inflated amounts and the firm returned the excess to defendants by check at defendants' request.

### 4. *Count XX.*

A voucher dated June 24, 1960, was paid to the firm of Ridgely and Wexler. It was testified that, at the time of preparation of the invoice, the firm was not owed any money for work done on the Embarcadero Project, that the invoice was requested by the defendants and that, on receipt of the State Mutual payment check, Ridgely and Wexler turned over the full amount to defendants.

## C. EMBARCADERO MUNICIPAL IMPROVEMENT DISTRICT.

In April 1960, Senate Bill No. 37 was passed by the California Legislature, creating the Embarcadero Municipal Improvement District. The bill provided that the district could issue tax-free bonds for public purposes. Defendants became directors and officers of the district: Steele became president and Harris became finance officer.

Pursuant to the bond authorization provisions of the bill, a bond issue for various construction purposes in the amount of $8,874,000 was authorized by district resolution and vote. Of this authorized issue, bonds in the face value of $1,207,000 were sold; the net amount to the district was $1,167,953.74. Senate Bill No. 37 provided that a tax lien would attach to the land as the revenue source for the repayment of principal and interest for the bonds sold.

The proceeds from the bond sale became the opening deposit for three separate district bank accounts at the Bank of America, Goleta Branch, on April 10, 1961. On April 10, 1961, a $602,940.76 cashier's check was purchased from the bank from funds deposited to the district account. The cashier's check was payable to the Embarcadero Ranchos, Inc., and was deposited to the Embarcadero Ranchos' account at the Union Bank, Beverly Hills branch on April 10,

1961. On the same day, $600,000 of this fund was withdrawn from the Embarcadero Ranchos' account and put into a Harris and Steele corporate account at the same bank, known as Colonia Vista Properties' account. On April 25, 1961, $150,000 of this fund was removed from the Colonia Vista account and deposited into a Harris and Steele corporate account at the same bank, known as the Redova Development Corporation account.

The mechanics for the withdrawal of the $602,940.76 from the district originate from the provisions of Senate Bill No. 37 which allowed the district to purchase improvements on the district property. Embarcadero Ranchos assigned to the district off-site improvements and work done by the private corporation in a document detailing the work, person performing the work, and the amount paid by the private corporation for the work. This itemized work totaled the amount of $602,940.76 on the assignments so prepared, and upon the acceptance of the district, the district transferred the funds to Embarcadero Ranchos, Inc., as above noted. In effect, by this document, the district purchased the off-site work performed by the Embarcadero Ranchos, Inc. on the Embarcadero Project.

An examination of the work reflected on this assignment shows that the funds from L.A.T.D.'s impound account and the State Mutual ''off-site'' loan, paid originally for $534,879.53 of the work thereon detailed. Thus, $68,061.23 of the assignment did not originate with payments from the vouchers submitted by defendants to State Mutual or L.A.T.D.

On this $68,061.23, the majority of this amount $56,950.28) is found on a portion of the assignment designated *Rental Equipment*. Simply stated, the Embarcadero Ranchos assigned an hourly rental rate for equipment with the original L.A.T.D. vouchers, totaling $40,000 and multiplied the rate by the purported hours used. The superintendent of the project indicated that amounts reflected and invoiced on the assignment were inaccurate as to the work thereon designated. Individuals purporting to operate various equipment were called as witnesses and denied the use of the equipment as noted and reflected on the assignment. In addition, the assignment contained the salaries of a number of employees who were listed as performing work on ''off-site'' improvements when, in fact, they had performed no work or only a fraction of the work on off-site construction.

### 1. *Counts XXIV through XXXI.*

Counts XXIV through XXIX are based on alleged fraudulent use of the funds secured from the district and transferred through the Embarcadero Ranchos' corporate account to Colonia Vista and Redova Development bank accounts. These counts involve the cashing of Colonia Vista and Redova Development checks by various persons who received these checks for amounts either in excess of that which was owed and returned the excess to one or both of the defendants or who, as in one instance, cashed the check but retained the proceeds only temporarily, eventually turning the entire amount of the check over to defendant Steele.

### 2. *Counts XII and XIV.*

The Santa Barbara Coastal Lemon Company drew a check payable to Embarcadero Ranchos, Inc., care of defendant Steele. This check was in payment of lemons picked on the orchard portion of the Embarcadero Project. This check was cashed and divided into almost two equal cashier's checks payable to defendants. Defendant Steele's check was used to open a bank account under the name of A. T. Heitman, while defendant Harris' cashier's check went into his personal bank account. These acts constitute the basis of Count XII while the failure of the defendants to disclose receipt and disbursement of the Lemon Company's check on the books and records of Embarcadero Rancho, Inc., constitutes the basis of Count XIV.

### 3. *Counts XIII and XV.*

The Diamond Walnut Growers marketed walnuts grown at the Embarcadero Ranchos. The Diamond Walnut Growers made an advance payment by check to Embarcadero Ranchos, Inc., for walnuts. The check was cashed at a restaurant where defendants had an account in the name of Embarcadero Ranchos, Inc. This act constitutes the basis of Count XIII. The books of Embarcadero Ranchos, Inc., failed to reflect the receipt or disbursement of the Diamond Walnut Growers' check, constituting the basis of Count XV.

#### BELL CANYON PROJECT

During March 1960, parallel escrows were opened at the Union Bank concerning the transfer of a tract of land in Los Angeles County to Bell Canyon Ranchos, Inc. L.A.T.D. supplied the purchase money through the escrows for the acquisition of the land. The tract was tentatively divided into 302

lots, and that number of trust deeds were created with the beneficial interest therein transferred to L.A.T.D. to secure the necessary financing. The arrangements effectuated through the escrow instructions were by and through the directions of defendants and were completed on April 5, 1960.

In this project there were agreements between the parties concerned similar to the Embarcadero transaction described above, wherein part of the proceeds of the purchase of the trust deeds went directly into the escrow to supply the necessary purchase money; the remainder of moneys was held by L.A.T.D. in "withhold" accounts for the purpose of financing the construction of improvements and payment of interest on the trust deeds.

During the period of April 8, 1960, through June 7, 1960, work vouchers representing approximately $40,000 worth of work allegedly performed were presented by Bell Canyon to L.A.T.D. for payment in accordance with the impound agreement; that much money was released by L.A.T.D. from the impound account directly to the contractors, who in turn returned approximately $33,000 to defendants in the form of "kickbacks." These return funds form the basis for seven charges of grand theft alleged in Counts II, III, IV, V, VI, VII and XIX.

### COUNT I (CRIMINAL CONSPIRACY)

In addition to the facts discussed in the substantive counts additional evidence was offered in support of the charge of criminal conspiracy. Various vouchers were presented to L.A.T.D. for payment for work done by one Frank Isaac, a cement contractor, for which Mr. Isaac had already been paid and turned the money derived from the consequent L.A.T.D. check over to the defendants, or for work allegedly done by Mr. Isaac which Mr. Isaac did not perform or know about but for which L.A.T.D. paid defendant Steele.

M. I. Kennedy was a stone mason used for the construction of the entrance gate. At the time of trial, Mr. Kennedy was deceased. On November 5, 1959, Mr. Kennedy received an Embarcadero Ranchos' check. This check bears the endorsement of defendant Steele, and testimony indicates the check was cashed. An application for two cashier's checks made by defendant Steele used funds from this Kennedy check to purchase two cashier's checks payable to the defendants which were subsequently cashed by them.

Various accounting schedules were introduced at the trial

by a certified public accountant for the district attorney's office. These schedules detailed the checks reflected from an examination of the books of Embarcadero Ranchos, Inc., as well as the purpose for which the checks were drawn as detailed on the records. The schedule entitled "Funds expended for autos, restaurants and entertainment" reflected that Embarcadero Ranchos, Inc., expended $38,620.90 between July of 1959 and September of 1961 for expenses of this nature. According to the corporate books, defendant Steele withdrew $39,813.42 from the corporation, while defendant Harris withdrew $40,021.37. The corporate books reflected that a number of checks to cash were drawn totaling an amount of $31,681.67. These cash checks were without supporting invoices and were posted to the various corporate project accounts at the direction of the defendants. The cash checks available to the prosecution were put into evidence as part of an exhibit, and many of the cash checks in this exhibit bore the endorsement of defendant Steele.

As we understand the theory of the defense, as set forth in the briefs on appeal and as amplified at oral argument, it was as follows: (1) As to the allegations of theft from the corporations of which defendants were officers and managers: that these corporations were solely owned by defendants, were *alter egos* of defendants and thus that the diversions of corporate funds were merely dealing in their own funds—an activity not amounting to theft, since defendants could not steal from themselves; (2) As to the allegations of theft from L.A.T.D. and State Mutual: (a) that the monies in the "withhold" or "impound" accounts were the monies of the defendants (or of their *alter ego* corporations), being part of the proceeds of loans made to defendants and their corporations, and thus, also, not legally the subject of theft by defendants, since the improper diversion of these funds, if any, amounted merely to a breach of contract between lender and borrower; (b) that the improvements for which these monies were withheld and impounded were actually completed so that the monies diverted (if any) were excess funds to which defendants and their corporations would have been entitled to receive for their own account; (3) In addition, as to the allegations of theft from L.A.T.D.: (a) that defendants and L.A.T.D. were joint venturers with respect to the two subdivisions, and, therefore, there could be no theft but merely a possible civil liability in an action for accounting; (b) that the officers of L.A.T.D. were aware of the falsity of the sun-

dry vouchers submitted, and knowingly paid defendants the monies involved with such knowledge; (4) As to the allegations of theft from the various trust deed and bondholders, that the improvements were in fact completed and paid for, so that no loss resulted.

Defendants, as we understand them, urge these points both as defenses to allegations that any illegal taking of monies was involved and as showing that, even assuming illegal takings, they acted in good faith and in the belief that they were entitled to the various monies and, thus, lacked the essential felonious intent. As to intent, defendants urge also that it was the custom of the subdivision business in Southern California to divert monies from impound accounts for other purposes, so that defendants, relying on that custom and an implied consent of lending institutions, had neither made illegal withdrawals or acted with felonious intent.

I

■■ Defendants complain of the court's refusal to give certain instructions requested by them. These requested instructions were to the effect that if defendants were *alter egos* of their corporations they could not commit various offenses charged with respect to said corporations, and that if the president of L.A.T.D. was the *alter ego* of his companies and defendants were joint venturers with said companies, L.A.T.D. could not be considered a possible victim. Defendants requested these instructions because they believed them necessary for presenting the defenses above set out.

While the court declined to give the instructions requested, it did instruct extensively on the elements necessary to constitute the offenses charged. Significantly, the court also gave instructions relative to the defense of consent and to the defense of taking property which defendants honestly believed to be their own.

The jurors were instructed that: "Consent is a defense to Grand Theft and if such consent is found by you as to any count, the Defendants must be found not guilty as to such count."

The jurors were apprised that there may be consent on the part of a person or a corporation or other entity, and of the requisites therefor. They were apprised that it is not theft by larceny to take the property of another with his consent. They were also apprised that if they found a custom and usage in the business of construction financing which was

commonly known and which amounted to consent, then that consent was a defense to the particular offense.

As to the claimed ownership, the court instructed the jury that it is a sufficient defense to a charge of embezzlement ". . . that the property was appropriated openly and avowedly, and under claim of title preferred in good faith, even though such claim is untenable." And the jury was further instructed: "Thus, if you should find as to any count that the defendants took goods or money *which they honestly believed were their own* under a claim of title, such defendant or defendants are not guilty of larceny nor would such defendant be guilty of embezzlement of such property if it was openly and avowedly taken under a claim of title preferred in good faith." (Italics added.)

In the light of the record and of the instructions given, no prejudice is demonstrated by the court's failing to give the requested instructions. The following language in *People* v. *Theodore* (1953) 121 Cal.App.2d 17, 32 [262 P.2d 630] is applicable: "From a reading of all the instructions given, we are impressed that the trial judge correctly, fully and fairly advised the jury as to the kind, quantity and degree of proof necessary before appellants could be convicted of the offenses charged against them. This is all the law requires."

## II

Defendants contend that it was prejudicial to name certain alleged victims in the indictment and refer to them during the trial proceedings. These were a certain class of 625 trust deed holders in connection with the Embarcadero financing by L.A.T.D., a certain class of trust deed holders in connection with Bell Canyon financing by L.A.T.D., and a certain class of general obligation holders in connection with Embarcadero Municipal Improvement District financing. Basically, defendants' argument falls into two subdivisions: (1) that, as a matter of law, such alleged victims could not be the owners of any specific sum in money, in conjunction with the circumstance that the indictment specified thefts of money; and (2) that defendants were deprived of reasonable notice and opportunity to prepare their defense in that the identity of such alleged victims was too vague.

As to the first point, it was the People's theory that various groups of people had invested money in defendants' enterprises; that in return these people had received interests securing their monetary investments, and that these security

interests would be jeopardized by the diversion of funds from the improvement of those interests. In *People* v. *Applegate* (1949) 91 Cal.App.2d 163, 173 [204 P.2d 689], the court stated "that any 'legally recognizable interest' is sufficient to sustain an averment of ownership in and prosecution for embezzlement by a trustee." (In other words, the classes named had monetary interests recognizable in law which could be the object of theft.) ■ The triers of fact could reasonably conclude that the trust deed holders and bond-holders did have a monetary stake in defendants' enterprises and that their stake was jeopardized when funds were diverted from improvements. They were, therefore, properly named in the indictment and could be properly referred to during the trial.

In regard to the point concerning the lack of notice due to the vagueness of the indictments, the law is clear. In *People* v. *Geibel* (1949) 93 Cal.App.2d 147, the count in question charged forgery of a will but did not specify a particular victim; it was held that the information stated a public offense, the court saying, at page 164 [208 P.2d 743] : "When a pleading in a criminal case gives the accused notice of the offense of which he is charged it is sufficient. The particular circumstances and details thereof are furnished him by the transcript of the testimony upon which the indictment or information is predicated. . . ."

■ At oral argument, counsel urged that the lack of identification of the several thousand trust deed and bond-holders prevented defendants from showing consent on their part. However, this was a matter of defense, once the prosecution showed (as the jury here must have concluded) that the diversions were prima facie felonious. If, in fact, any trust deed or bondholders knew of defendants' actions and consented thereto, the identity of such persons must have been known to defendants. No effort to prove any such consent, by anyone of these classes was made. The argument is without validity.

### III

Defendants contend that they were denied their right not to be witnesses against themselves, and that the district attorney commented improperly with respect to limited testimony. Two weeks before the People had completed their case, defense counsel had just raised an objection to a certain document, on the ground that the original thereof was not in

court. He stated in substance that he felt the witness' testimony was not sufficient to show that the copy in court was a true and correct copy. Thereupon, the district attorney made the following statement in the presence of the jury, "It certainly would be a matter of cross-examination, and the defendants certainly have the right to take the witness stand and testify under oath as to what changes ——". The district attorney was then cut off by objection of defense counsel. The jury was not admonished.

Later during the trial, defendant Steele did take the stand and he did testify at length. However, defendant Harris took the stand for only a brief period. His testimony was limited in general to the activities of the defendants in connection with their real estate development at Better Community Homes. The district attorney, during the cross-examination of defendant Harris, attempted to launch into matters not covered in the direct examination as follows: "Q. Mr. Harris, what were your duties at Embarcadero Ranchos, Inc.?" Defense counsel immediately objected on the ground that the question exceeded the scope of direct examination. The objection was sustained. The following is an excerpt of the comments thereupon made by the district attorney: "If this defendant is, as to the other areas of involvement here, claiming his right not to testify, that is fine. He certainly has that right, but at least it is clearly understood." Other and similar comments occurred throughout the trial and the same position was taken at several places in the prosecution's argument to the jury. In addition, the trial court, in instructing the jury, also adverted to the failure of a defendant to testify and on the inferences which could and could not be drawn from that fact.

While, at the time of trial, these comments, argument based on defendants' failure to testify, and the trial court's instructions, were proper under the law of this state as it then stood (Cf. *People* v. *Modesto* (1965) 62 Cal.2d 436, 447-454 [42 Cal.Rptr. 417, 398 P.2d 753]), it has since been determined by the United States Supreme Court, in *Griffin* v. *California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106], that such comment violates a constitutional right of the defendant. The Attorney General does not dispute that error occurred; he argues only that, since erroneous comment requires reversal only if it is prejudicial (*People* v. *Bostick* (1965) 62 Cal.2d 820 [44 Cal.Rptr. 649, 402 P.2d 529]), no such prejudice occurred here.

■ We do not agree. The definitive test, in California, for the application of the prejudicial error doctrine of article VI, section 4½ of our state Constitution was in *People* v. *Watson* (1956) 46 Cal.2d 818, where the Supreme Court said (at p. 836 [299 P.2d 243]): ". . . it appears that the test generally applicable may be stated as follows: That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." In *People* v. *Bostick, supra* (1965) 62 Cal.2d 820, 824-825, our Supreme Court quoted from the opinion of the Supreme Court of the United States, in *Wilson* v. *United States* (1893) 149 U.S. 60, 70 [13 S.Ct. 765, 37 L.Ed. 650], the following rule: ". . . such improper and forbidden reference by counsel for the prosecution shall be regarded as good ground for a new trial in all cases where the proofs of guilt are not so clear and conclusive that the court can say affirmatively the accused could not have been harmed from that cause."—a rule which the court characterizes as "less liberal than our *Watson* rule."

As we have pointed out above, defendants' principle ground of defense was the contention that, even if the sundry diversions of funds were illegal, they had acted in good faith and in a justified belief that they were entitled to conduct the financial affairs of the corporations and district in the manner alleged. The case went to the jury on that theory. But the comments, and more particularly the instruction, were directed at the very heart of the defense. While the prosecution relied, in part, on the argument that the conduct shown against defendants was inherently inconsistent with bona fides, still it made much, during trial and argument, of the failure of either defendant to vouch for his integrity on the stand, under oath and subject to cross-examination.

■ In this case, the People had the difficult burden of proving to the satisfaction of the jury, beyond a reasonable doubt, that the involved business transactions laboriously described in this long and cumbersome record were carried out with fraudulent intent. The failure of defendants to come forward and testify on that issue was a fact which the jury could readily grasp. It is not unreasonable to believe that comment upon defendants' failure to testify had a strong persuasive effect.

Upon a review of the record as a whole, we conclude that the error cannot be disregarded as harmless.

### IV

We do not consider the other errors urged in the briefs and in argument. Most of them are not likely to recur at any retrial; whether or not defendants are eligible for probation on the charges against them can better be determined, if necessary, in the light of the verdicts reached on such retrial.

The judgments are reversed.

Files, P. J., and Jefferson, J., concurred.

A petition for a rehearing was denied July 28, 1965, and respondent's petition for a hearing by the Supreme Court was denied September 15, 1965. Mosk, J., did not participate therein.