[L.A. No. 29837. In Bank. Sept. 13, 1971.]

DAVID C. BURREY et al., Petitioners, v.
EMBARCADERO MUNICIPAL IMPROVEMENT DISTRICT et al.,
Respondents;
WALLOVER, INC., Intervener.

## COUNSEL

James R. Christiansen for Petitioners.

Wilson, Jones, Morton & Lynch and Robert G. Auwbrey for Respondents.

Hill, Farrer & Burrill, William S. Scully, Jr., Joel H. Jubelier and Marvin E. Garrett for Intervener.

## OPINION

**PETERS, J.**—In this mandamus proceeding, petitioners, residents of the Embarcadero Municipal Improvement District (EMID), challenge the voting provisions governing election of the board of directors of the district on the ground that these provisions violate the one person, one vote rule

required by the equal protection clause of the Fourteenth Amendment. We conclude, for reasons discussed below, that in the absence of a legislative provision transferring the voting power from the landowner-developer to the residents of the district, the voting scheme set forth in sections 20 and 64 of the Embarcadero Municipal Improvement District Act (EMID Act) violates the Fourteenth Amendment for two reasons: first, it accords extraordinarily more voting strength to some of the district's voters than to others, and, second, it precludes nonlandowning residents from voting at all.

The EMID was created by the Legislature in 1960 under authorization of the EMID Act (Stats. 1961, First Ex. Sess. 1960, ch. 81, p. 441),[1] and has jurisdiction over approximately 1,250 acres of land located in Santa Barbara County. The EMID and the Estero Municipal Improvement District, a sister district located in the San Francisco Bay Area (Stats. 1961, First Ex. Sess. 1960, ch. 82, p. 459), were established by virtually identical statutes at the instance of land developers to enable them, through the use of the districts' bonding power, to raise the necessary risk capital to develop the properties as subdivisions. (See Willoughby, *The Quiet Alliance* (1965) 38 So.Cal.L.Rev. 72.)

The Estero District gave rise to Foster City, while the EMID languished for five years in or near bankruptcy, assertedly as a result of various misrepresentations and misappropriations by the land speculators who became its first directors. (See Willoughby, *supra,* 38 So.Cal.L.Rev. 72, 73, fn. 5; *People* v. *Steele* (1965) 235 Cal.App.2d 798 [45 Cal.Rptr. 601].)[2] Although the receiver in bankruptcy finally managed to sell the land to new developers, the district suffered a further setback when it was unable to dispose of sewage as originally planned because a law passed in the interim made the planned system financially unfeasible. Now, with the sewer problem resolved, landowners are able to acquire building permits and development can proceed at a more rapid pace.

Most of the land in the EMID continues to be held by nonresident landowners. Intervener Wallover, Inc. alone owns more than 65 percent of the real property in the district as of the last equalized assessment roll. Despite its troubles, however, the EMID has managed to acquire approximately 200 residents, 47 of whom join as petitioners in this action, and it can be

---

[1]Hereafter, unless otherwise indicated, section references are to sections of the EMID Act, as amended.

[2]In *Steele,* the directors' criminal convictions were reversed because the prosecutor commented on their failure to testify. The court reasoned that the business transactions giving rise to the charges were so extensive and complicated that the prosecutor's readily understood innuendos may well have had a strong persuasive effect on the jury.

anticipated that in the future it will progress toward its maximum projected population of 4,550.

The Legislature's stated purpose in passing the act was to bring otherwise "impossible" municipal improvements to an uninhabited area of the state and to facilitate the development of a private small craft harbor, thus conserving available moneys for public harbors. (§ 215.) To achieve this goal it invested the district with virtually all the powers of a city except the power to zone.

Thus, the act states that the EMID may provide the major services and utilities cities normally supply their residents. It may, for example, construct and maintain street lighting and facilities for sewage and garbage disposal, drainage, reclamation, and water treatment and distribution. (§ 77.) It may maintain a fire department and police force. (§ 79.) It has the power to create parks and recreational facilities (§ 77), including a small craft harbor. (§ 78.) It may pass regulations concerning utilities, fire and police services, violation of which constitutes a misdemeanor (§ 97), compel residents to use sewer and garbage services (§ 98), and charge residents for all facilities and services furnished by it (§ 99).

The EMID also has the same powers to fund and carry out its operations as cities do: It has the same right and power of eminent domain as is conferred on the legislative body of a city (§ 81) and the power to acquire, hold and dispose of "property of every kind" within or without the district. (§ 80.) It may incur bonded indebtedness. (§ 87.)[3] It also has the power to collect a tax on both the taxable real and personal property within the district. (§ 162.)

Unlike a city, however, the district was to be created from an uninhabited tract of undeveloped land. In order to promote the development of the land, the Legislature created a system for selecting the governing board of the district which vests long-term and virtually total control of the district in the hands of the developing landowner. That system, which petitioners challenge by this proceeding, is as follows:

Under the EMID Act as amended in 1969 (Stats. 1969, ch. 174), the governing board of the district, charged with the extensive power and responsibilities set forth above, consists of five members, who are, along with a secretary, the officers of the district. (§ 26.) The board is elected by the

---

[3]To date the EMID has authorized general improvement bonds in the amount of $2,722,000 and sold, approximately $650,000 of them, authorized $394,000 water improvement bonds and sold $250,000; and authorized $758,000 sewer improvement bonds of which $307,000 have been sold. Street, water and sewer improvements have been initiated.

district's voters. The act defines voter as the owner of land, including a corporation owning land (as shown in the last equalized county assessment roll) or its representative. (§§ 19, 20.) In addition, not every voter has the same number of votes; rather each voter has "one vote for each one dollar ($1) in assessed valuation of land owned by him as shown in the last equalized assessment roll." (§ 64.) Thus, intervener Wallover, Inc., which owns more than 65 percent of the assessed valuation of land within the EMID can guarantee that its candidates for the EMID board will win. Similarly, Wallover, Inc. can guarantee that the EMID will issue general obligation bonds if Wallover, Inc. so desires.

## I

■ In election cases, where, as here, the issues are of great public importance and must be resolved promptly, we will exercise our original jurisdiction in mandamus proceedings. (*Westbrook* v. *Mihaly,* 2 Cal.3d 765 [87 Cal.Rptr. 839, 471 P.2d 847] [vacated on other grounds (1971) 403 U.S. 915 (29 L.Ed.2d 692, 91 S.Ct. 2224)]; *Farley* v. *Healey,* 67 Cal.2d 325, 326-327 [62 Cal.Rptr. 26, 431 P.2d 650]; *Miller* v. *Greiner,* 60 Cal.2d 827, 830 [36 Cal.Rptr. 737, 389 P.2d 129], and cases cited therein; *Perry* v. *Jordan,* 34 Cal.2d 87, 90-91 [207 P.2d 47].) The issues are important because they concern the impairment of the right to vote; their resolution is urgent because an election, at which two or three of the five board seats are to be filled for a four-year term, is scheduled for early November 1971.

Intervener, Wallover, Inc., contends that extraordinary relief should be denied because petitioners were not diligent in bringing this action. It argues that petitioners must have known of the voting procedure for many years, since the act was passed in 1960. But petitioners could not have been expected to have brought this suit before they became residents of the EMID, which, because of the district's legal and financial problems, was for most petitioners a relatively recent event. Also, it was not until very recently that the United States Supreme Court cases have seriously called the constitutionality of the EMID Act provisions into question.

And even if petitioners were not maximally diligent, we should not perpetuate the unconstitutional voting procedure for another two years and its effect another four thus denying all the residents of the EMID a proper voice in their district. ■ As Chief Justice Warren, writing for the majority in *Reynolds* v. *Sims* (1964) 377 U.S. 533, 585 [12 L.Ed.2d 506, 541, 84 S.Ct. 1362], stated: "[I]t would be the unusual case in which

a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan."[4]

Respondents argue that we should not exercise our jurisdiction because there exist numerous questions of fact which must be resolved prior to any decision in the case. The petition for writ of mandate does contain allegations of fact which are controverted by respondent and intervener. We are satisfied that these disputed facts are either not material to our resolution of the case, or may be resolved by judicial notice.

## II

In *Avery* v. *Midland County* (1968) 390 U.S. 474 [20 L.Ed.2d 45, 88 S.Ct. 1114], the United States Supreme Court held that the "one person, one vote" rule which had theretofore been applied to state and federal governmental elections also applies to those local governmental units "having general governmental powers over the entire geographic area. . . ." (*Id.*, at pp. 484-485 [20 L.Ed.2d at p. 53].) Looking to the Texas Constitution and various Texas statutes, the court noted that the commissioners court was the general governing body of Midland County and concluded that Texas county commissioners courts must be districted according to population. (*Id.*, at pp. 482-484 [20 L.Ed.2d at pp. 52-53].)

The Supreme Court subsequently found an exercise of "general governmental powers" by as specialized a unit as a junior college district. In holding the "one person, one vote" rule applicable to the junior college district, the court, in *Hadley* v. *Junior College District* (1970) 397 U.S. 50, 53-54 [25 L.Ed.2d 45, 49, 90 S.Ct. 791], noted that the district could tax, issue bonds, supervise teachers and students, make contracts, pass on petitions to annex land to the district, condemn land and generally manage the junior college. It stated that these powers, "while not fully as broad as those of the Midland County Commissioners [in *Avery, supra*], certainly show that the trustees perform important governmental functions within the districts, and we think these powers are general enough and have sufficient impact throughout the district to justify the conclusion that the principle which we have applied in *Avery* should also be applied here." (*Id.*)

Applying these principles to the EMID, it is apparent that its powers within the geographic area controlled by it exceed in potential impact and pervasiveness the powers exercised by the junior college district in *Hadley*,

---

[4]Intervener's arguments that petitioners should have petitioned the EMID board or the Legislature before seeking judicial relief are without merit. The EMID has no power to rule its enabling act unconstitutional or in any other manner to change the provisions of that act. Nor has it ever been held necessary to petition the Legislature to change a statute before seeking a judicial determination of its unconstitutionality.

and, in fact, come close to those exercised by the county commissioners in *Avery*.

A brief review of the EMID's powers establish their general governmental character. As recited above, the EMID may issue regulations which have the force of law, operate a police force and fire department, exercise the power of eminent domain, tax, incur bonded indebtedness, and create and maintain all manner of public utilities. In short, the EMID is for most purposes a small but growing city and lacks few of the powers normally held by municipal governments.[5]

Its powers are more general than those exercised by the junior college district because it is the sole local governmental unit entrusted with carrying out the basic municipal functions which directly affect and benefit each of the district's residents. These powers closely resemble those of the Midland County commissioners as described by the Supreme Court in *Avery:* "[T]he court does have power to make a large number of decisions having a broad range of impacts on all the citizens of the county. It sets a tax rate, equalizes assessments, and issues bonds. It then prepares and adopts a budget for allocating the county's funds, and is given by statute a wide range of discretion in choosing the subjects on which to spend. In adopting the budget the court makes both long-term judgments about the way Midland County should develop—whether industry should be solicited, roads improved, recreation facilities built, and land set aside for schools—and immediate choices among competing needs." (*Id.*, at p. 483 [20 L.Ed.2d at pp. 52-53].)

■ It inescapably follows from the powers invested in the district that the "one person, one vote" rule must apply to the EMID.[6] We therefore turn to the specific challenges raised by the petitioners.

---

[5]There can be no doubt that city governments are local governmental units having general powers over the entire geographic area for purposes of the Fourteenth Amendment. The following language from *Avery* is typical of recent cases: "We . . . see little difference, in terms of the application of the Equal Protection Clause and of the principles of *Reynolds* v. *Sims,* between the exercise of state power through legislatures and its exercise by elected officials in the cities, towns, and counties." (*Avery* v. *Midland County, supra,* 390 U.S. 474, 481 [20 L.Ed.2d 45, 51].)

[6]Respondent also contends that the "one person, one vote" rule does not apply because the board selection does not constitute an election. It cites a series of old California cases holding that when a special district with few or no residents makes land ownership the qualification for participating in the selection of the district's governing body, this participation constitutes a "property-owner appointment" rather than an election. (See, e.g., *Barber* v. *Galloway,* 195 Cal. 1, 11-12 [231 P. 34]; *Tarpey* v. *McClure,* 190 Cal. 593, 606 [213 P. 983]; *People* v. *Sacramento Drainage Dist.,* 155 Cal. 373, 389 [103 P. 207]; *People* v. *Reclamation District No. 551,* 117 Cal. 114, 123-124 [48 P. 1016].) We need not comment upon the continuing validity of these cases; they do not govern here. The EMID now has a substantial number of residents and will steadily be acquiring more as the district develops.

Petitioners first challenge section 64 of the act which provides that each voter shall have one vote for each dollar of assessed value of the real property owned by him. ■ They rely on a long series of United States Supreme Court cases which have held, in the words of the most recent case, "a qualified voter has a constitutional right to vote in elections without having his vote wrongfully denied, debased, or diluted." (*Hadley* v. *Junior College District, supra,* 397 U.S. 50, 52 [25 L.Ed.2d 45, 49], and cases cited therein; see also *Avery* v. *Midland County, supra,* 390 U.S. 474, 480 [20 L.Ed.2d 45, 50-51]; *Reynolds* v. *Sims, supra,* 377 U.S. 533, 554-555 [12 L.Ed.2d 506, 522-524].)

Although those cases involved district malapportionment we have concluded that the equality principle announced therein is applicable when the weighted vote is based on property value as well as district apportionment. *Reynolds* v. *Sims, supra,* 377 U.S. 533, in holding malapportioned legislative seats unconstitutional, used an illustration which is in point: "It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the State's voters could vote two, five or 10 times for their legislative representatives, while voters living elsewhere could vote only once. And it is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by two, five, or 10, while the votes of persons in another area would be counted only at face value, could be constitutionally sustainable." (*Id.,* at p. 562 [12 L.Ed.2d at pp. 527-528].)

By assigning voting strength based on extent of landownership, the EMID Act voting provisions are precisely this "inconceivable" and "extraordinary" type of voting law.

We do not find the fact that the voter's vote is weighted by virtue of the quantity of land he holds rather than the district in which he resides, a viable distinction between the *Reynolds*-type cases and the instant case. *Reynolds* states that the right to vote is a personal and individual one and the judicial focus in voting discrimination cases must always be whether there has been discrimination against individual citizens which impermissibly impairs their constitutionally protected right to vote. (*Id.,* at p. 561 [12 L.Ed.2d at pp. 526-527]; see also *Avery* v. *Midland County, supra,* 390 U.S. 474, 478 [20 L.Ed.2d 45, 49-50].) From an individual viewpoint, it hardly matters to the voter whether it is his next door neighbor, a stranger in another district, or a nonresident land developer whose vote is assigned substantially more weight than his own: the disparity dilutes his voting strength and makes of his attempt to affect the court of his local government through the ballot box a bootless and empty gesture.

Having established that the equal voting strength principle applies to the EMID voting scheme, the conclusion that the scheme is unconstitutional is inescapable. At least in the absence of a compelling state interest for the voting scheme, *Hadley* v. *Junior College District, supra,* 397 U.S. 50, held that ". . . once a State has decided to use the process of popular election and 'once the class of voters is chosen and their qualifications specified, we see no constitutional way by which equality of voting power may be evaded.' " (*Hadley* v. *Junior College District, supra,* 397 U.S. 50, 59 [25 L.Ed.2d 45, 52]; see also *Phoenix* v. *Kolodziejski,* 399 U.S. 204, 209 [26 L.Ed.2d 523, 527-528, 90 S.Ct. 1990].)[7] The Legislature has provided that the EMID board be selected by an elective process.

It should also be pointed out that the inequality of voting strength in this case, as compared to district apportionment cases, is all the more questionable for being based directly upon the land-wealth of the voter. ▉ As the Supreme Court said in *Harper* v. *Virginia Bd. of Elections* (1966) 383 U.S. 663, 666 [16 L.Ed.2d 169, 172, 86 S.Ct. 1079], "[A] State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter . . . an electoral standard. Voter qualifications have no relation to wealth. . . ." (See also, *Cooper* v. *Leslie Salt Co.,* 70 Cal.2d 627, 641 [75 Cal.Rptr. 766, 451 P.2d 406] (dissenting opinion); cf. *Kirkpatrick* v. *Preisler* (1969) 394 U.S. 526, 533 [22 L.Ed. 2d 519, 526, 89 S.Ct. 1225].) Like the feudal landlords of old, the land-wealthy developer, under the EMID's voting system, controls the destiny of the EMID community while the "land poor" residents have no effective voice in selecting those who will be governing the affairs with which they are so vitally concerned.

In conclusion, it would be difficult to imagine a more radical variation in voting strength than results from this land value voting scheme. As Wallover, Inc. itself asserts, the weighting of votes by land value has continued to guarantee that corporation well over a majority of the votes. Instead of "one person, one vote" we have here a case of "one corporation, 285,689 votes." Such a radical departure from the principle of equality can be sustained, if at all, only by the most compelling of state interests.

Petitioners next challenge the constitutionality of section 20 of the

---

[7]*Hadley's* implication appears to be that there can be no state interest sufficiently compelling to justify weighted voting in elections to bodies exercising general governmental powers. (It does recognize that there could exist a case in which the duties of an elected functionary "are so far removed from normal governmental activities and so disproportionately affect different groups" that a popular election might not be required—but the EMID plainly does not fall within that exception.) In any event, we find, as we point out below, no compelling interest to justify the EMID voting scheme. (*Id.,* at p. 56 [25 L.Ed.2d at p. 51].)

EMID Act which limits the right to vote to the district's landowners, thereby excluding residents who are not owners. They cite in support of this challenge three cases recently decided by the United States Supreme Court, *Kramer* v. *Union School District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886], *Cipriano* v. *City of Houma,* 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897], and *Phoenix* v. *Kolodziejski, supra,* 399 U.S. 204, wherein that court struck down voting statutes which provided that only landowners could vote on local governmental measures.

In *Kramer* the court, in reviewing a New York statute which limited the vote on school board elections to parents of school children and lessees and owners of real property, stated: "Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives. Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest. [Citation.]" (*Id.,* at pp. 626-627, fn. omitted [23 L.Ed.2d at p. 589].) The court concluded that the New York voting scheme did not narrowly limit the vote to those "primarily interested" in the election. Instead, the court found the classification both over and under inclusive and on that basis found it was not justified by the asserted compelling state interest; hence, it was unconstitutional.

In *Cipriano,* the Supreme Court in a per curiam opinion struck down a Louisiana statute which allowed only landowners to vote on the issuance of city revenue bonds. The court stated that whether a statute limiting the franchise to "specially interested" voters denies equal protection to otherwise qualified but excluded voters "depends on 'whether all those excluded are in fact *substantially less interested or affected* than those the statute includes.'" (*Id.,* at p. 704 [23 L.Ed.2d at p. 651], italics added.) The court found that the nonproperty owners were as substantially affected and directly interested in the issuance of the revenue bonds as the property owners. It noted that both were vitally affected by the public utility services to be established with the funds derived from the bonds. It also noted that nonlandowners as well as landowners took part in repaying the bonds through utility charges.

Finally, in *Kolodziejski,* the court struck down an Arizona constitutional and statutory scheme which permitted only landowners to vote on the issuance of city general obligation bonds. The Supreme Court found that although property and nonproperty owners have somewhat *different* interests, there was no basis for concluding that nonproperty owners were substantially *less* interested in the issuance of the bonds. The court noted that all

residents had a substantial interest in the public services and facilities to be made available through funds derived from the bonds. It also found that nonproperty owners were interested even if the bonds were to be repaid solely through taxes on real property. The court noted that the cost of such taxes would inevitably be passed on, in large part, to lessees and all consumers.

Applying these principles to the present case, it must be obvious that the disenfranchisement of the nonlandowner residents of the EMID is unconstitutional unless as we will next discuss their exclusion serves a compelling state interest. The interest of nonlandowner residents, while it may, particularly in the case of the developer, be a somewhat different interest, is not one substantially *less* than that of landowners. As in *Cipriano* and *Kolodziejski,* nonlandowners have a vital interest in the district which provides them with public utilities. Nonlandowners are also affected by the price the district charges for its services, and by its tax rate, since the district has the power to tax personal as well as real property. And even if the district only taxed real property, under the *Kolodziejski* case nonlandowners would still have a sufficient interest to entitle them to a vote.

Nonlandowners resident in the EMID are even more .clearly interested and affected than the excluded voters in *Kramer, Cipriano* and *Kolodziejski* by virtue of the district's power to require them to use its sewage services, its power to provide (or withhold) police and fire protection and its power to pass regulations having the force of law. In short, each of the residents of the EMID have virtually the same interest in the affairs of the district as they would in any municipal government. We can no more permit the exclusion of some of the EMID's residents from the vote than we could the residents of any town, city, or county. Unless the exclusion of nonlandowners serves a compelling state interest, this section, like section 64 of the act, cannot be sustained.

The state proclaimed its interest in the EMID's voting scheme in section 220, subdivision (g), of the EMID Act: "The land in the district is not owned by residents. The owners are the ones primarily concerned with the district and the ones who will be supporting the district. The owners should therefore hold the voting power. Since no general law district with the nec-. essary powers provides for voting by owners, special legislation is necessary."

The Legislature's stated interest in excluding nonproperty owners is precisely the one rejected in *Kramer, Cipriano* and *Kolodziejski.* In each of those cases, the state urged in justification of excluding nonlandowners the primary concern of property owners with the matters voted upon. In each

case, the Supreme Court analyzed the interests of other residents and concluded that the interests of nonlandowning residents were such that they could not be deprived of their right to vote.[8] As pointed out above, the residents of the EMID have at least as much interest in the affairs of the district as did the nonlandowning residents in those cases. Nor does section 220, subdivision (g), offer a justification for the provision assigning votes according to assessed valuation of property owned when a substantial number of people have become residents of the district, which people are more deeply concerned and affected by many of the district's powers than the developers.[9]

Moreover, the interest set forth in section 220, subdivision (g), dissolves, by its own terms, when residents become owners of district land.

Respondents concede there will come a time in the development of the EMID when voting power must shift from the owner-developer to the district's resident registered voters if the EMID Act is to pass constitutional muster. It asserts, however, that at its present stage of development the voting scheme established by the EMID Act serves a compelling state interest in that it is a built-in means of insuring that the Legislature's purpose in passing the EMID Act—the subdivision and development of the EMID for residential use—is carried out. By "stacking" the voting scheme so that the developer can retain complete control of the EMID board, achievement of the state's interest in development is thereby, according to respondents, guaranteed.

Respondents suggest that once the "developmental" aspects of the dis-

---

[8]Respondents also rely upon *Schindler* v. *Palo Verde Irrigation Dist.* (1969) 1 Cal.App.3d 831 [82 Cal.Rptr. 61]. That case held that the compelling state interest in the reclamation of land justified limiting the franchise to landowners, who, the court found, enjoyed the benefits and suffered the burdens of the irrigation district. This decision may be difficult to reconcile with the Supreme Court cases on this subject, particularly *Kolodziejski* which was decided after *Schindler*. (See *Girth* v. *Thompson* (1970) 11 Cal.App.3d 325, 330 [89 Cal.Rptr. 823].) However, since irrigation districts are substantially different from the EMID—their powers are fewer and more limited to the particular purpose for which the districts were created—we do not reach that question here.

[9]The resident's potential plight under a voting system such as the EMID's is described by Thomas H. Willoughby, a consultant to the Assembly Committee on Municipal and County Government, as follows: "[T]he developer is in complete control of the district, of all services offered by the district, of the planning and construction of recreational and other facilities by the district, of management of the district and of issuance of bonds by the district—now and for many years into the future. A purchaser will have no control of the indebtedness which may be incurred on his behalf, nor will he have any recourse if the district management is unsatisfactory. In the event that the area does not develop as anticipated, tax rates could become excessive; and in the event of default on district bonds, each purchaser would be subject to sale of his property." (Willoughby, *supra*, 38 So.Cal.L.Rev. 72, 75.)

trict are concluded and it begins to function as a general governmental unit, then and only then does the EMID Act become unconstitutional. It cites in support of this contention *Cooper* v. *Leslie Salt Co., supra,* 70 Cal.2d 627,.a case upholding, inter alia, the voting provisions of the EMID's sister district, the Estero Municipal Improvement District.

Respondents' reliance upon *Cooper* is misplaced. The majority of the court there refused to hold the voting provisions unconstitutional because the Legislature had already amended the Estero Municipal Improvement District Act to provide for the necessary transition of voting power. The majority said: "[T]he Legislature has recognized that as the character of the district gradually changes from uninhabited to that of an area with substantial numbers of resident registered voters it is appropriate that voting power likewise gradually shift. Since the transfer of control from owners to resident voters will be completely accomplished by the close of 1971, no occasion is shown for interference by this court with the programming spelled out by the Legislature." (*Id.,* at p. 638.)[10]

The EMID Act, unlike the Estero Municipal Improvement District Act, was never amended to provide for a transfer of power from nonresident property owners to resident registered voters. It might be argued that the purpose of the weighted voting system was to provide such a transition since the developer loses voting power and the vote is spread more evenly as the district's property is transferred to potential residents.

But this "built-in" transfer has no necessary correlation to the rate at which the district becomes a developed community and the state's interest in development disappears. The developer could for example retain large parcels of valuable land, such as the proposed yacht harbor, a shopping center or other business properties long after the community had developed. We cannot abandon the residents' right to full and equal participation in the EMID community to so haphazard and fickle a transfer scheme.[11]

The Legislature has seen fit to create a district with extensive and pervasive powers over the land and the people within it. ■ Its concurrent

---

[10]The scheme found acceptable by a majority of this court in *Cooper* accomplished the transference of power by providing that an increasing number of the board members be selected solely by the residents of the district at each successive election until all of the board members were elected by residents. This solution does not share the basic infirmity of the EMID scheme, since under the EMID Act, the landowner-developer has sufficient votes to elect *all* the members of the board for a long time to come and residents therefore have no effective- voice in district affairs.

[11]In view of our conclusion, we need not determine whether *Kramer* v. *Union School District, supra,* 395 U.S. 621, *Cipriano* v. *City of Houma, supra,* 395 U.S. 701, and *Phoenix* v. *Kolodziejski, supra,* 399 U.S. 204, which the United States Supreme Court decided subsequent to *Cooper,* require the Legislature to provide a more expeditious transfer of power than that approved by *Cooper.*

failure to provide a voting system which early transfers the voting power from those who presently hold it under sections 20 and 64 of the act to its proper recipients, the interested, affected and otherwise qualified voters within the district, renders those sections unconstitutional.

Let the peremptory writ issue directing the Embarcadero Municipal Improvement District and its board of directors to disregard and not follow the provisions of sections 20 and 64 of the Embarcadero Municipal Improvement Act in the November 2, 1971, election and all elections thereafter, and to conduct such elections in accordance with the one person, one vote rule required by the Fourteenth Amendment to the United States Constitution as set forth in this opinion.[12]

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Respondents' petition for a rehearing was denied October 13, 1971.

[12]We do not, by this holding, foreclose alternative legislative schemes which facilitate the development of the district without conflicting with the provisions of this decision.